**NONCONFIDENTIAL**

**No. 12-1581**

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT
_____

HAMILTON BEACH BRANDS, INC.,

Plaintiff-Appellant,

v.

SUNBEAM PRODUCTS, INC.
(doing business as Jarden Consumer Solutions),

Defendant-Appellee.

_____

Appeal from the United States District Court for the Eastern District of
Virginia in case no. 11-CV-0345, Judge James R. Spencer

## BRIEF FOR PLAINTIFF-APPELLANT

Robert M. Tyler (VSB No. 37861)
Kristen M. Calleja (VSB No. 41319)
William N. Federspiel (VSB No. 76716)
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (Fax)

Attorneys for Plaintiff-Appellant Hamilton
Beach Brands, Inc.

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Hamilton Beach Brands, Inc. _____ v. Sunbeam Products, Inc. _____

No. 12-1581 _____

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Hamilton Beach Brands, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Hamilton Beach Brands, Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Hamilton Beach Brands, Inc.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Hamilton Beach Brands, Inc. is an indirect subsidiary of NACCO Industries, Inc., a publicly traded corporation.  No other publicly held entity owns ten percent or more of the stock of Hamilton Beach Brands, Inc.

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

See Attached

_____

August 23, 2012 _____

Date

/s/ Robert M. Tyler _____

Signature of counsel

Robert M. Tyler _____

Printed name of counsel

Please Note: All questions must be answered
cc: Timothy C. Bass _____

124

**Attachment to the Certificate of Interest (Form 9)**

**4.**     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robert M. Tyler
Kristen M. Calleja
William N. Federspiel
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (Fax)
rtyler@mcguirewoods.com
kcalleja@mcguirewoods.com
wfederspiel@mcguirewoods.com

Frederick A. Tecce
John D. Simmons
Stephen E. Murray
Bijal Shah-Creamer
Panitch Schwarze Belisario & Nadel llp
2005 Market Street, Suite 2200
Philadelphia, PA 19103
(215) 965-1330
(215) 965-1331 (Fax)
ftecce@panitchlaw.com
jsimmons@panitchlaw.com
smurray@panitchlaw.com
bshah@panitchlaw.com

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. App. P. 25(d)(1)(B), I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following registered CM/ECF user:

Timothy C. Bass
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
basst@gtlaw.com
*Attorney for Appellee Sunbeam Products, Inc.*

I further sent copies of the foregoing by electronic mail to:

Richard D. Harris
Kevin J. O'Shea
Matthew J. Levinstein
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
harrisr@gtlaw.com
osheak@gtlaw.com
levinsteinm@gtlaw.com

Kimberly A. Warshawsky
GREENBERG TRAURIG, LLP
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
warshawskyk@gtlaw.com

*Attorneys for Appellee Sunbeam Products, Inc.*

    /s/ Robert M. Tyler

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE ................................................................3

STATEMENT OF THE FACTS ................................................................4

    I.    Hamilton Beach's Research and Development Program Invents a Wildly Successful Slow Cooker. ................................................................4

        A.    The Development Process and Supplier Dealings ....................5

        B.    The Stay or Go® Slow Cooker's Success ................................7

    II.    Hamilton Beach Applies for the '831 Patent to Protect Its Slow Cooker Invention and Substantial Investment in Research and Development. ................................................................8

    III.    Sunbeam's Blatant Copying of Hamilton Beach's Invention. ..............9

    IV.    Hamilton Beach Secures the '928 Patent to Reassert its Slow Cooker Invention. ................................................................10

SUMMARY OF THE ARGUMENT ................................................................11

ARGUMENT ................................................................13

    I.    The District Court Erroneously Construed the Term "Hook," Which Should Have Been Given Its Plain and Ordinary Meaning ................................................................13

        A.    The Language of the '928 Patent Supports Affording "Hook" Its Plain and Ordinary Meaning. ................................14

            1.    Nothing in the Specification or Claims Suggests that "Hook" Should Have Anything Other Than its Plain and Ordinary Meaning ................................14

            2.    The District Court's Construction of "Hook" Is Not Supported By the Specification or Claim Language ................................................................17

# TABLE OF CONTENTS
### (continued)

Page

B.  Because No Special Meaning Was Assigned to "Hook" During Prosecution, the District Court's Construction Was Erroneous. ........................................................20

    1.  Hamilton Beach Did Not Substantially Amend Its Claims. ........................................................22

    2.  The Arguments in Response to Office Action Were Directed to Modifying Language in Claim 3 and Not to the Use of "Hook" in Other Claims.............23

    3.  The District Court's Construction Relied on Language Taken Out of Context From the Prosecution History. ......................................................26

II.  The District Court's Erroneous Summary Judgment of Non-Infringement Is Rooted in Flawed Constructions of "Hook" and "Around the Container Rim.".............................................29

A.  Sunbeam's Cook & Carry Has a "Hook" Under that Term's Plain and Ordinary Meaning. ......................................29

B.  Sunbeam's Device Contains a "Hook. . . Shaped to Extend from the Lever and Around the Container Rim.".........31

III.  The District Court Erred in Invalidating the '928 Patent for Containing New Matter. ......................................................35

A.  The District Court Incorrectly Required Hamilton Beach to Establish Priority, Misapplying the Burden of Persuasion on Invalidity Based on New Matter. ....................37

B.  The District Court Disregarded Substantial Evidence that Created a Genuine Issue of Material Fact with Regard to New Matter. ..........................................................40

V.  The District Court Erroneously Found the '928 Patent Invalid Under the On-Sale Bar. ......................................................49

A.  The District Court Failed to Determine Whether the Product at Issue Met All of the Elements of the Asserted Claims. ......................................................50

# TABLE OF CONTENTS
## (continued)

**Page**

B.  The District Court Improperly Resolved Disputes of
Material Fact and Drew Inferences Against the Non-
Moving Party in Finding There Was a Commercial Offer
for Sale. .....................................................................................53

CONCLUSION ....................................................................................58

REQUEST FOR ORAL ARGUMENT ................................................59

## CONFIDENTIAL MATERIAL OMITTED

The material omitted in the brief and its Addendum contains confidential information redacted pursuant to the parties' Agreed Protective Order, which is included in the Addendum attached to this brief.  The material omitted on pages 5-7, 49, 51-53, and 54-57 describes Hamilton Beach's confidential product development process and confidential dealings with a supplier; the material omitted from pages 9-10, and 45 discusses Sunbeam's market share and facts related to its product design.

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">**Cases**</span>

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
  299 F.3d 1336 (Fed. Cir. 2002) ........................................................................50

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
  340 F.3d 1298 (Fed. Cir. 2003) ..........................................................16, 28, 29

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*
  632 F.3d 1246 (Fed. Cir. 2011) ...................................................................24, 45

*Bilstad v. Wakalopulos*,
  386 F.3d 1116 (Fed. Cir. 2004) ........................................................................44

*Brown v. 3M*,
  265 F.3d 1349 (Fed. Cir. 2001) ........................................................................15

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002) ........................................................................14

*Comaper Corp. v. Antec, Inc.*,
  596 F.3d 1343 (Fed. Cir. 2010) ........................................................................14

*Commonwealth Scientific. & Indus. Research Org. v. Buffalo Tech. (USA), Inc.*,
  542 F.3d 1363,1379 (Fed. Cir. 2008) ...................................................40, 42, 48

*Cordis Corp. v. Medtronic AVE, Inc.*,
  339 F.3d 1352 (Fed. Cir. 2003) ........................................................................43

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*,
  635 F.3d 1373 (Fed. Cir. 2011) ........................................................................36

*Dana Corp. v. Am. Axle & Mfg., Inc.*,
  279 F.3d 1372 (Fed. Cir. 2002) ........................................................................50

*E-Pass Techs., Inc. v. 3COM Corp.*,
  343 F.3d 1364 (Fed. Cir. 2003) ........................................................................43

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002) ......................................................................23, 24

*Golight, Inc. v. Wal-Mart Stores, Inc.*
    355 F.3d 1327 (Fed. Cir. 2004) ................................................25, 26

*Grober v. Mako Products, Inc.*,
    686 F.3d 1335 (Fed. Cir. 2012) ................................................passim

*Group One, Ltd. V. Hallmark Cards, Inc.*,
    254 F.3d 1041 (Fed. Cir. 2001) ........................................49, 50, 54

*Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*,
    No. 3:11-cv-345, 2012 U.S. Dist LEXIS 97923 (E.D. Va. July 13, 2012) .........4

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008) ............................................16

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
    370 F.3d 1131 (Fed. Cir. 2004) ............................................22

*InterDigital Commc'ns., LLC v. ITC*,
    690 F.3d 1318 (Fed. Cir. 2012) ....................................26, 45

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
    292 F.3d 728 (Fed. Cir. 2002) ............................................51

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
    177 F.3d 968 (Fed. Cir. 1999) ........................................15, 43, 44, 45

*Lampi Corp. v. Am. Power Prods.*,
    228 F.3d 1365 (Fed. Cir. 2000) ............................................40

*Linear Tech. Corp. v. Micrel, Inc.*,
    275 F.3d 1040 (Fed. Cir. 2001) ........................................53, 54, 57

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ........................................40, 44

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011) ....................................................35, 38

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
   75 F.3d 1545 (Fed. Cir. 1996) ............................................................20

*Monon Corp. v. Stoughton Trailers, Inc.*,
   239 F.3d 1253 (Fed. Cir. 2001) ..................................................57, 58

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
   806 F.2d 1565 (Fed. Cir. 1986) ..................................................50, 58

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...........................14, 15, 26

*PowerOasis v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008) ..................................................37, 38

*Praxair, Inc. v. ATMI, Inc.*,
   543 F.3d 1306 (Fed. Cir. 2008) ..........................................................43

*Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ............................................................35

*SanDisk Corp. v. Memorex Prods., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ..................................................26, 27

*Scaltech Inc. v. Retec/Tetra, L.L.C.*,
   178 F.3d 1378 (Fed. Cir. 1999) ..........................................................50

*Schindler Elevator Corp. v. Otis Elevator Co.*,
   593 F.3d 1275 (Fed. Cir. 2010) ..................................................16, 21

*SunRace Roots Enter. Co. v. SRAM Corp.*,
   336 F.3d 1298 (Fed. Cir. 2003) ..........................................................16

*SunTiger, Inc. v. Scientific Research Funding Grp.*,
   189 F.3d 1327 (Fed. Cir. 1999) ..................................................36, 48

*Technology Licensing Corp. v. Videotek, Inc.*,
   545 F.3d 1316 (Fed. Cir. 2008) .............................................37, 38, 39

*Upjohn Co. v. MOVA Pharm. Corp.*,
   225 F.3d 1306 (Fed. Cir. 2000) ..........................................................48

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................14, 20, 29, 33

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008) ..................................................................26, 45

STATUTES

28 U.S.C. § 1291 ............................................................................................2

28 U.S.C. §§ 1331 and 1338(a)......................................................................1

35 U.S.C. § 102(b) ......................................................................3, 12, 49, 51, 53

35 U.S.C. § 112 ......................................................................................40, 44

35 U.S.C. § 282(a) ........................................................................................35

Misc. No. 12-00137 (Fed. Cir. docketed Sept. 9, 2012)...........................1

OTHER AUTHORITIES

http://dictionary.reference.com/browse/hook?s=t ...................................16

*Merriam Webster's Collegiate Dictionary* 557 (10th ed. 1993).
    Dictionary.com...................................................................................16

Rule 56 ........................................................................................................51

U.S. Patent No. 7,947,928...............................................................passim

## STATEMENT OF RELATED CASES

*In re Belisario*, Misc. No. 12-00137 (Fed. Cir. docketed Sept. 9, 2012), concerns testimonial and document subpoenas served by Defendant-Appellee Sunbeam Products, Inc. ("Sunbeam") upon patent prosecution and trial counsel for Plaintiff-Appellant Hamilton Beach Brands, Inc. ("Hamilton Beach"). The subpoena respondents moved the United States District Court for the Eastern District of Pennsylvania to quash the subpoenas. That court did not rule on the motion, instead transferring the dispute to the United States District Court for the Eastern District of Virginia, the venue of the underlying patent infringement action. The subpoena respondents appealed that transfer decision to the United States Court of Appeals for the Third Circuit, and the appeal was transferred by stipulation to this Court in September, 2012. Sunbeam and the subpoena respondents have agreed they will stay that appeal pending resolution of this appeal.

## JURISDICTIONAL STATEMENT

This appeal arises from a July 13, 2012 final judgment of the United States District Court for the Eastern District of Virginia, granting Sunbeam's motion for summary judgment. The district court had subject matter jurisdiction over Hamilton Beach's patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a). Hamilton Beach timely filed a notice of appeal on August 1, 2012,

giving this Court appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erroneously construed the claim term "hook" to mean "the portion of the clip that simultaneously extends or lies, at least partially, in both the vertical and horizontal planes when in the closed or locked position," eschewing that term's plain and ordinary meaning.

2.  Whether, in granting summary judgment of non-infringement, the district court erroneously concluded that no reasonable juror could find that Sunbeam's accused device contains the "hook" element present in all the asserted claims of the patent-in-suit.

3.  Whether, in granting summary judgment of non-infringement, the district court erroneously concluded that no reasonable juror could find that Sunbeam's accused device contains a claimed "hook . . . shaped to extend from the lever and around the container rim."

4.  Whether the district court erred in granting summary judgment of invalidity on the ground that new matter was added to the patent-in-suit.

5.  Whether the district court abused its discretion in denying Hamilton Beach's motion for summary judgment of no invalidity on the ground that no new matter was added to the patent-in-suit.

6.      Whether the district court erred in granting summary judgment of invalidity

under the on-sale bar of 35 U.S.C. § 102(b).

## STATEMENT OF THE CASE

Hamilton Beach sued Sunbeam on May 24, 2011 for infringing Hamilton

Beach's U.S. Patent No. 7,947,928 (the "'928 Patent").  A119-25.  Sunbeam

answered the complaint and counterclaimed seeking a declaration of non-

infringement and patent invalidity.  A308-12.

After the parties filed simultaneous claim construction statements, the

district court held a *Markman* hearing on November 18, 2011.  Hamilton Beach

sought leave to supplement its proposed claim construction to address issues that

had been discussed at oral argument but which were not fully developed in the

parties' statements.  A1905-07.  The district court denied leave and, without

providing any supporting analysis, construed a number of terms in the '928 patent.

A19-20; A1945.  Among them was "hook," which the district court defined as "the

portion of the clip that simultaneously extends or lies, at least partially, in both the

vertical and horizontal planes when in the closed or locked position." A20.

The parties filed cross-motions for summary judgment.  A2038-40; A3199-

203.  Hamilton Beach sought a summary judgment that Sunbeam had infringed

claims 1 and 3-7 of the '928 patent and a summary judgment that the '928 patent

was not invalid for the addition of new matter.  A2038-40.  Sunbeam sought

-3-

summary judgment of non-infringement and patent invalidity.  A3199-203.  The

latter argument rested upon four legs: the alleged introduction of new matter into

the '928 patent; the on-sale bar; the public use bar; and obviousness.  A3200-01.

On July 13, 2012, the district court denied Hamilton Beach's motion in its

entirety and granted in part Sunbeam's motion for summary judgment.  A21-60;

*Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, No. 3:11-cv-345, 2012 U.S.

Dist LEXIS 97923 (E.D. Va. July 13, 2012).  The district court found no literal

infringement.  It also held the '928 patent was invalid as anticipated, first because

it added new matter not disclosed in the specification of its predecessor patent and

therefore was not entitled to claim that patent's priority date, and, second, because

of a commercial offer for sale involving a product practicing the '928 patent more

than one year before the priority date.  *Id.*  The district court denied the remainder

of Sunbeam's summary judgment motion and entered final judgment.  *Id.*; A61.

## STATEMENT OF THE FACTS

I.    **HAMILTON BEACH'S RESEARCH AND DEVELOPMENT PROGRAM INVENTS A
      WILDLY SUCCESSFUL SLOW COOKER.**

Hamilton Beach is a leading producer of small kitchen appliances such as

blenders, coffee makers and, of particular relevance here, slow cookers.  During

the last seven years, Hamilton Beach enhanced its reputation and brand name

recognition among consumers of slow cookers, in part by investing significantly in

research and development to improve various features of Hamilton Beach's slow

Confidential information subject to the parties' Protective Order
has been redacted on this page.

cookers. A190-95. Those advancements led to the award of several United States

patents, including those relevant here.

Hamilton Beach has been particularly innovative in developing solutions for

portable slow cookers. Although slow cookers have been used for decades, they

were prone to leaking and spilling when transported. A82 (col. 1, ln. 16-34);

A1223; A1241 (40:2-10); A1245-47 (57:25-58:2, 59:19-22). In 2005, months of

preliminary design work led to the discovery of a novel solution – a slow cooker

incorporating over-the-center clips to seal the lid to the container and prevent

leakage.

## A.    The Development Process and Supplier Dealings

The path to that discovery was marked with serious hurdles. In early 2005,

Hamilton Beach encountered considerable problems producing a working model

that secured the lid sufficiently to prevent leaks. A4924-25 (137:7-138:24)  In

February 2005, [███████████████████████████████

███████████████████████]. A4915; A5002-03. The problem continued into

the spring, as Hamilton Beach [███████████████████████]. A5005-

07. These repeated failures required a series of changes throughout the spring,

including to the [███████████████████████████████████

███████████████████████████████]. A4924-25 (137:7-138:24);

A4915; A5002-03; A5005-07. [███████████████████████

Confidential information subject to the parties' Protective Order has been redacted on this page.

[████████████████████████████████]. A5005.

Long before Hamilton Beach overcame these challenges, however, its project management software system issued a February 8, 2005 purchase order to [████] (the "Purchase Order"). This Purchase Order was computer-generated and was not the result of customer demand or projections. A4975.

As was standard, the Purchase Order [████████████████████]. A4992-96; A5194-218. [████████████]
[██████████████████████████████]
[██████████████████████████████]
[███████████████████]. A5211. [████████████]
[███████████████████████]
[████████████████████████████████]. *Id.*
[████████████████████████]
[██████████████████████████████]
[███████████]. A4002 [██████████████████]
[████████].

Given that it referenced a product still in development, [██████████]
[██████████████████████████]
[███████████████████████]
[███████████████████████]

Confidential information subject to the parties' Protective Order
has been redacted on this page.



]. A4975, A4977-83. [

]. A4991-96. [

]. A4991.

In view of the ongoing leakage problems, neither party intended to enter into a binding contract for the slow cooker in February 2005. Indeed, at that point Hamilton Beach was still unsure [

]. A4883-84 (217:7-218:22); A4891-92 (275:6-276:3); A4915; A5002-03. Hamilton Beach only secured the required UL approval three months later. A5127-33.

**B.    The Stay or Go® Slow Cooker's Success**

Ultimately, Hamilton Beach solved the sealing problems and debuted a product practicing its invention – the Stay or Go® slow cooker – in late 2005. A190. Hamilton Beach's investment in technological advancement, allied with investments in advertising and marketing reaped dividends. A190-92. The Stay or Go® slow cooker was enormously successful, and Hamilton Beach's market share increased by over 30 points, a sevenfold increase. A191-92. This success was driven almost entirely by the Stay or Go® slow cooker's portability, itself a direct

-7-

result of Hamilton Beach's lid-sealing invention.  A1188; A1194; A1200; A1223.

## II. HAMILTON BEACH APPLIES FOR THE '831 PATENT TO PROTECT ITS SLOW COOKER INVENTION AND SUBSTANTIAL INVESTMENT IN RESEARCH AND DEVELOPMENT.

On March 1, 2006, Hamilton Beach filed U.S. application number

11/365,222 (the "'222 application"), which matured into United States Patent No.

7,485,831 (the "'831 patent").  As filed and as issued, the '831 patent's written

description discloses, among other things, the use of at least one clip – "a generally

conventional over-the-center clip having a hook 22a and a lever 22b, such that

manipulation of the lever 22b causes engagement or release of the hook 22a of the

clip 22," A2599 (ln. 31) – A2600 (ln. 1), A71 (col. 5, ln. 17-20) – to fasten a slow

cooker's lid to inhibit leakage from inside the container.  A2599 (ln.31) – A2601

(ln. 12), A71 (col. 5, ln. 13 – col. 6, ln. 18).  More specifically, it discloses a hook,

attached to a lever, that latches onto a catch to selectively seal the lid in place to

prevent leakage.  A2599 (ln. 30) – A2226 (ln. 1), A2600 (ln. 10-12), A71 (col. 5,

ln. 17-20, 34-38).

A preferred embodiment of the '831 patent's invention mounts the hook and

the lever on the side wall of the slow cooker and the catch on the lid.  A2600 (ln. 1-

3, 10-12); A71 (col. 5, ln. 20-22, 34-38.).  However, nothing in the written

description of the '831 patent limits the invention disclosed to a single

embodiment. The inventors of the '831 patent already had conceived of an

-8-

Confidential information subject to the parties' Protective Order
has been redacted on this page.

alternative configuration, with the catch on the side wall, and mounting the hook

and lever on the lid.  A2617 (221:4-25); A2622 (99:10-22); A4856; A4859-67.

### III.   SUNBEAM'S BLATANT COPYING OF HAMILTON BEACH'S INVENTION.

Sunbeam is one of Hamilton Beach's primary competitors in the small

kitchen appliance market.  A192.  Before Hamilton Beach introduced the Stay or

Go® slow cooker, Sunbeam commanded more than 70% of the dollar share of the

U.S. market.  *Id.*  Hamilton Beach's innovative slow cooker, however, challenged

Sunbeam's market dominance [



].  *Id.*; A5028.

In 2008, [

].  A5028; A1267-

68.  [

].  A1270-71.  [

].  A1201.

[

].  A5030-32.  [

Confidential information subject to the parties' Protective Order
has been redacted on this page.

██████████████████████████████████████████████

████████████████████████████████████████ ]. A5060-63 (244:22-247:15);

A5066-69 (250:22-253:11). That [ ███████████ ] debuted as Sunbeam's Cook &

Carry slow cooker in late 2010. A193. The product [ █████████████████████

██████████████████████████████████████████████

█████████████████ ]. A1318; A1332; A1337; A1341.

## IV. HAMILTON BEACH SECURES THE '928 PATENT TO REASSERT ITS SLOW COOKER INVENTION.

Hamilton Beach quickly took action, filing application number 12/794,284

(the "'284 application") under the United States Patent and Trademark Office's

Accelerated Examination program. The '284 application was filed as a

continuation of a continuation of the '222 application, through which Hamilton

Beach sought to claim certain aspects of its invention that were simply disclosed in

the '831 patent; namely, that while the hook and lever could be mounted on the

side wall with the catch on the lid (as in the preferred embodiment of the '831

patent) the hook and lever also could be mounted on the lid, with the catch on the

side wall. A2220-41. A person of ordinary skill in the art would recognize that

each claim element in the '928 patent was rooted in the original specification of the

'831 patent. A3149-53.

In an office action, in pertinent part, the examiner suggested that U.S.

Design Patent No. 129,108 ("Sprague") taught a clip of the type claimed in the

'284 application, rendering the invention obvious. A2469-74.  Sprague's camera case had a flat hook and latch clip spanning a single plane defined by the case's side wall and part of the lid.  A2500.

In its response to the office action, Hamilton Beach amended Claims 3 and 7 from dependent to independent form by incorporating the language of other independent claims.  A2492.  Neither of these amendments limited any claim terms.  Turning to the examiner's obviousness objection, Hamilton Beach argued, *inter alia*, that the modifying language already found in original Claim 3 – "the hook being shaped to extend from the lever and around the container rim" – sufficiently distinguished the hook in Claim 3 and dependent Claim 4 from Sprague's single-plane hook, since Hamilton Beach's hook necessarily lays in "two different planes defined by a lid and side wall."  A2500-01.

Hamilton Beach overcame the objection, and the '928 patent issued on May 24, 2011. A75.

## SUMMARY OF THE ARGUMENT

The district court erred both in claim construction and, on summary judgment, in its infringement and invalidity analyses.

First, the district court erroneously rejected the plain and ordinary meaning of the claim term "hook," adopting an unduly narrow construction unsupported by the intrinsic evidence.  It repeated that mistake on summary judgment, implicitly

and incorrectly construing the phrase "hook . . . . shaped to extend from the lever and around the container rim" contrary to the intrinsic evidence. Based upon its erroneous constructions, the district court concluded that Sunbeam's slow cooker did not infringe the '928 patent because it did not have the requisite "hook" element present the asserted claims or the "hook . . . shaped to extend from the lever and around the container rim" found in Claims 3, 4 and 7. Using the more appropriate plain and ordinary meaning of the terms, however, there is at least a jury question of literal infringement.

Second, on summary judgment, the district court erred in holding that the '928 patent was invalid for containing new matter not within the grandparent application upon which it claimed priority. The district court's new matter analysis improperly required Hamilton Beach to prove that the '928 patent did not contain new matter, a reversal of the applicable burden of proof, and the district court improperly ignored substantial evidence in Hamilton Beach's favor demonstrating that the original application sufficiently disclosed the invention in the '928 patent. Indeed, given that Sunbeam's only proffered evidence was conclusory expert testimony bereft of material fact, the district court abused its discretion by not granting Hamilton Beach summary judgment on this issue.

Third, on summary judgment, the district court erroneously held the '928 patent invalid under the on-sale bar of 35 U.S.C. § 102(b), in view of the February

2005 Purchase Order.  In reaching this decision, the district court failed to conduct the required analysis to determine whether the product at issue in the Purchase Order fully anticipated the '928 patent.  It also ignored substantial evidence, favoring Hamilton Beach, showing that the Purchase Order was not a commercial offer to buy and was never accepted, and that the product at issue in the Purchase Order did not meet a critical claim element of the '928 patent.

## ARGUMENT

### I.   THE DISTRICT COURT ERRONEOUSLY CONSTRUED THE TERM "HOOK," WHICH SHOULD HAVE BEEN GIVEN ITS PLAIN AND ORDINARY MEANING.

The term "hook," which appears in asserted Claims 1 and 3-7, has a common and easily understood meaning: a curved device for catching, holding or pulling.  Seizing upon a phrase found only in independent Claim 3 and dependent Claims 4 and 7, and reading the related prosecution history entirely out of context, the district court mistakenly limited "hook" to "the portion of the clip that simultaneously extends or lies, at least partially, in both the vertical and horizontal planes when in the closed or locked position." A20.  This construction, which this Court reviews without deference, *Grober v. Mako Products, Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012), is unsupported by the intrinsic evidence.  The court erred by not giving "hook" its plain and ordinary meaning.

### A.    The Language of the '928 Patent Supports Affording "Hook" Its Plain and Ordinary Meaning.

Claim construction begins with the claim language, which this "[C]ourt generally gives . . . its 'ordinary and customary meaning.'" *Id.* at 1341 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc)). Indeed, given a "heavy presumption" that a claim term carries its ordinary and customary meaning, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002), terms must be accorded their ordinary and customary meaning unless the patentee chooses to act as his own lexicographer and assigns them a special meaning that is clearly stated in the patent specification or file history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Failing to do so is "unjust to the public, as well as an evasion of the law." *Phillips*, 415 F.3d at 1312 (quotations omitted). Absent such special meaning, a general dictionary definition is an appropriate guide. *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010).

### 1.    Nothing in the Specification or Claims Suggests that "Hook" Should Have Anything Other Than its Plain and Ordinary Meaning.

This is a case in which "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."

*Phillips*, 415 F.3d at 1314. "Hook" is a straightforward, commonly understood term, readily understood by artisans and judges alike. It is not a "technical term[] of art, and do[es] not require elaborate interpretation." *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding "or" in "at least one of two-digit, three-digit, or four-digit year-date representations" is not a technical term of art needing elaborate interpretation); *see also Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999) (applying the ordinary meaning of "series of threads," which has no specialized meaning to those skilled in the art).

In the claims of the '928 patent, the hook is part of "an over-the-center clip having a hook and a catch, one of the hook and catch being mounted on one of the lid and side wall of the housing and the other of the hook and catch being mounted on the other of the lid and side wall" so that the clip can "selectively retain the lid in sealing engagement with the container rim" by engaging the catch to retain the lid on the container rim. A85-86 (col. 9, ln. 8-12, 18-19). The specification explains that the clip is "a generally conventional over-the-center clip having a hook 22a and a lever 22b, such that manipulation of the lever 22b causes engagement or release of the hook 22a of the clip 22" and only provides explicit definitions for the terms "right," "left," "upper," and "lower." A77-78; A82 (col. 2, ln. 44-46); A84 (col. 5, ln.15-18). The meaning of "hook" in this "generally

conventional" clip is readily discernible by one of ordinary skill in the art – it is a curved device for catching, holding or pulling.[1]

Nothing in the specification indicates that "the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1304 (Fed. Cir. 2003) (quotations and citation omitted) (finding statements in claims, specification and prosecution history did not limit claim term); *see Grober*, 686 F.3d at 1343; *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1282-83, 1285 (Fed. Cir. 2010) (finding no disclaimer in claims, specification or prosecution history); *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) (finding patentee did not assign special meaning to "partially" in claims, specification or prosecution history, and applying that term's plain and ordinary meaning); *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003) (reversing limiting

---

[1] Webster's defines "hook" as "a curved or bent device for catching, holding, or pulling." *Merriam Webster's Collegiate Dictionary* 557 (10th ed. 1993). Dictionary.com defines "hook" as "a curved or angular piece of metal or other hard substance for catching, pulling, holding, or suspending something." Dictionary.com, hook, http://dictionary.reference.com/browse/hook?s=t. Because nothing in the intrinsic evidence suggesting a particular meaning, those definitions are "entirely appropriate . . . sources for context – to aid in arriving at the plain meaning of a claim term." *Helmsderfer*, 527 F.3d at 1382.

constructions of "back surface," "protrusion" and "mate" where the claims, specification and prosecution history did not indicate intent to deviate from terms' ordinary meaning).

The '928 patent does not define "hook" in any way and does not disclaim any subject matter or otherwise limit the scope of the term "hook." "Hook" appears throughout the specification, never once with anything approaching a disavowal of its plain meaning or broad interpretation. Accordingly, nothing in the '928 patent indicates that "hook" was intended to carry a specialized definition that differs from its plain and ordinary meaning.

### 2. The District Court's Construction of "Hook" Is Not Supported By the Specification or Claim Language.

The district court refused to apply the plain and ordinary meaning of "hook," instead construing the term as "the portion of the clip that simultaneously extends or lies, at least partially, in both the vertical and horizontal planes when in the closed or locked position." That overly narrow construction lacks support in the plain language of the '928 patent.

The claims do not recite that the hook, side wall or lid must lie in either a vertical or horizontal plane or that the hook must be curved or bent to a specific angle. The claims merely indicate that the hook must extend from the lid to the side wall or *vice versa* because the hook and catch are each mounted on the side

wall or the lid, and the clip - which includes the hook and catch - is selectively

engageable with the lid and side wall.  For instance, Claim 1 requires:

> at least one clip . . . having a *hook* and a catch, one of the *hook* and
> catch being mounted on one of the lid and side wall of the housing
> and the other of the *hook* and catch being mounted on the other of the
> lid and sidewall of the housing, the at least one clip being selectively
> engageable with the lid and side wall of the housing to selectively
> retain the lid in sealing engagement with the container rim to inhibit
> leakage of the food stuffs from the interior of the container . . . .

A85 (col. 8, ln. 34-44) (emphasis added).

The clip selectively retains the lid in a sealing engagement with the

container rim.  This is done with either the hook or the catch mounted to the lid,

and the other mounted to the side wall, so that the hook can engage the catch to

retain the lid to the container rim.  This is done by placing the "*hook* . . . around the

catch," A86 (col. 9, ln. 26-27) (emphasis added), which is "a small, slightly

hooked, elongate protrusion to selectively engage the *hook* of the clip."  *Id.* (ln. 31-

32) (emphasis added).  The hook and catch work together to secure the *lid* of a

slow cooker to the container rim, not to secure a *horizontal plane* to the container

rim.  To secure a lid extending at an angle from the lid of the side wall, A77-78,

the hook would have to bend or curve.  That is a general feature of a hook.

Requiring the hook to lie in both the vertical and horizontal planes suggests

that the hook must form a right angle.  Yet, the claims simply do not require that

portions of the hook lie in any particular angle relative to one another, or that the

hook lie in particular planes. The exact planes of the hook are irrelevant to the patent claims.

Moreover, while the district court focused on supposedly required planes of the hook, it wholly ignored the critical function of the hook in this invention. The hook engages the catch to secure the slow cooker's lid to the container rim. *See, e.g.*, A75 ("[t]he at least one clip is an over-the-center clip and includes a hook and a catch to selectively retain the lid in sealing engagement with the container rim"); A84 (col. 5, ln. 45-48) ("[w]hen the hook 22a is placed around the catch 42a, the lever 22b of the clip 22 can be rotated downwardly and inwardly toward the side wall 20b of the housing 20 to create a retaining force exerted by the clip 22 on the lid"). But unlike the plain and ordinary meaning, which recognizes that a hook is curved to catch, hold or pull, the district court's definition ignores that the hook must *secure the lid* to the container rim by *engaging the catch*.

The district court's construction also improperly omits the preferred embodiment, illustrated in Figure 2 of the '928 patent, which makes clear that the hook never "simultaneously extends or lies, at least partially, in both the vertical and horizontal planes when in the closed or locked position:"



Rather, the hook lies in a generally vertical plane defined by the side wall and a generally horizontal plane, largely defined by the angled lid of the slow cooker. A claim construction, such as the district court's, that does not read on a preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics*, 90 F.3d at 1583; *see also Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996) (holding that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation"). As in *Vitronics*, that evidence "is wholly absent in this case." 90 F.3d at 1583.

### B. Because No Special Meaning Was Assigned to "Hook" During Prosecution, the District Court's Construction Was Erroneous.

With nothing in the '928 patent suggesting that "hook" should bear some special meaning, the plain and ordinary meaning of "hook" must apply – and the district court's limiting construction must be wrong – unless Hamilton Beach clearly and unmistakably disavowed the scope of that term during prosecution.

Indeed, the only support Sunbeam offered for its proposed construction for "hook" was a fragment of an argument Hamilton Beach made during prosecution. A1693.

Sunbeam argued to the district court that, in response to the Examiner's obviousness rejection, Hamilton Beach substantially amended the claims of the '928 patent and "defined the claim term 'hook.'" A1693. According to Sunbeam, Hamilton Beach had distinguished its "hook" from the hook disclosed in Sprague by arguing first that the '928 claimed a hook that "must 'simultaneously extend or lie, at least partially, in both planes (i.e., vertical and horizontal) in the closed or locked position,'" and second that this is the necessary structure for any container having a lid. *Id.* The district court implicitly adopted this argument in adopting Sunbeam's proposed construction.[2]

This Court has urged caution with the expansive use of file history in claim construction. Although prosecution history "can inform whether the inventor limited the claim scope in the course of prosecution, it often produces ambiguities created by ongoing negotiations between the inventor and the PTO." *Grober*, 686 F.3d at 1341. Consequently, prosecution disclaimer occurs only "where an applicant, whether by amendment or argument, unequivocally disavowed a certain meaning to obtain his patent." *Schindler Elevator*, 593 F.3d at 1285 (quotation

---

[2] The district court adopted Sunbeam's proposed construction but provided no explanation or analysis in its claim construction order. A19-20.

omitted). Only a "clear and unmistakable disavowal of scope during prosecution" gives rise to prosecution disclaimer. *Grober*, 686 F.3d at 1341 (quotation omitted).

As shown below, *infra* Sections I.B.2. and 3., Hamilton Beach's response to the examiner was read wholly out of context; nothing in the file history of the '928 patent constitutes a clear and unmistakable disavowal of scope of "hook."

### 1. Hamilton Beach Did Not Substantially Amend Its Claims.

Contrary to Sunbeam's assertion, Hamilton Beach did not respond to the Examiner's objection by "substantially amending the claims." A1693. More importantly, the amendments did not in any way limit or narrow the meaning of the term "hook" and, in fact, were unrelated to the term hook.

Claims 1, 4, and 5 all contain the term "hook," but none of these claims were amended during prosecution. A2492. Hamilton Beach amended only Claims 3 and 7. A2492. Even there, Claim 3 was simply amended from dependent form to independent form by incorporating all the language of Claim 1, and Claim 7 was amended by incorporating language of Claims 1 and 6.[3] A2488-90; A2492. Because Claim 1 was not cancelled, the amendment to Claim 3 does not constitute a narrowing amendment. *See Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1141-42 (Fed. Cir. 2004) (holding that rewriting a dependent claim into independent form may constitute a narrowing amendment if the original

---

[3] Claim 7 ultimately issued as Claim 6 in the '928 patent, as original Claim 6 was cancelled. A2492.

independent claim is cancelled). The amendment to Claim 3 was a cosmetic

change in form that did not narrow the scope of the claim and therefore does not

raise an estoppel. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S.

722, 736-37 (2002). While original Claim 6 was cancelled, any alleged difference

in scope between original Claim 6 and amended Claim 7 is wholly unrelated to the

term "hook," as "hook" did not even appear in either Claims 6 or 7, as originally

filed. A2232; A2489-90. Accordingly, neither amendment disavowed the plain

and ordinary meaning of the term "hook."

> **2. The Arguments in Response to Office Action Were Directed to Modifying Language in Claim 3 and Not to the Use of "Hook" in Other Claims.**

In response to the obviousness rejection, Hamilton Beach marshaled several

arguments addressing all the claims to demonstrate they were not obvious. A2492-

99. Sunbeam, though, hones in on an additional argument, entitled "Amended

Independent Claim 3." That argument was limited to independent Claim 3 – the

only independent claim containing language modifying the term "hook" – and its

sole dependent claim, Claim 4. A2500. It was there – and only there – that

Hamilton Beach argued that modifying language ("the hook *being shaped to*

*extend from the lever and around the container rim*") sufficiently distinguished the

hook in Claim 3 and dependent Claim 4 from Sprague. A2501 (emphasis in

original). Because Hamilton Beach's argument was not directed to the use of

"hook" in other claims, which lack the modifying language, the district court erred by using it to limit the construction of "hook" throughout the patent.

Sprague's camera case had a flat hook and latch clip spanning a single plane defined by the case's side wall and part of the lid.  A2500.  Hamilton Beach pointed out that its hook, by contrast, was "*shaped* to extend between the lever and the lid around a container rim when the container is disposed within a heating cavity of the housing."  Of necessity, the hook was "*structurally in two different planes (i.e., a generally vertical plane defined by the side wall of the housing and a generally horizontal plane defined by the lid* for covering an opening of a container within the housing).  *Id.* (emphasis added).  Hamilton Beach simply emphasized the shape of the hook claimed in Claim 3 to distinguish it from the single plane hook in Sprague.  This argument does not suggest – let alone clearly and unmistakably show – that Hamilton Beach intended to disclaim the plain and ordinary meaning of "hook" used throughout the '928 patent.

This Court has found no clear disclaimer of scope where, as here, the relevant language in the prosecution history is directed to only a particular claim or claims.  For example, in *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, this Court reversed a construction of the term "spring metal adaptor" which required that the adaptor be "split."  632 F.3d 1246 (Fed. Cir. 2011).  The defendant argued that the patentee had adopted the "split" limitation during prosecution by

-24-

introducing that limitation in two of three claims to have been rejected as anticipated. *Id.* at 1255. The applicant had not included the limitation into the third claim, however, but had changed it instead into an independent claim, and the patent had issued without addition of the split limitation into the third claim. *Id.* Under those circumstances, this Court found that the prosecution history did not support applying the "split" limitation to all claims of the patent at issue. *Id.*

Similarly, there was no prosecution disclaimer in *Golight, Inc. v. Wal-Mart Stores, Inc.*, where the evidence did not unambiguously indicate that the patentee had intended to specially define the term "rotating." 355 F.3d 1327 (Fed. Cir. 2004). The accused infringer saw a disclaimer of scope where the patentee had amended the rejected claims to recite at least 360 degrees of rotation. *Id.* at 1332-33. This Court, however, held that the applicant's argument reasonably could be understood to apply only to claims explicitly reciting that the rotation must be through 360 degrees. *Id.* at 1332. Because the asserted claim in the litigation did not contain that limitation, the scope of "rotating" in that claim had not been disavowed. *Id.* at 1332-33.

Hamilton Beach directed this particular non-obviousness argument only to independent Claim 3 (and dependent Claim 4) because the shape limitation modifying "hook" in Claim 3 is conspicuously absent in independent Claims 1, 5 and 6. The "clear implication" of claim-specific modifying language is that the

term is not so limited in an independent claim lacking that modifying language.

*InterDigital Commc'ns., LLC v. ITC*, 690 F.3d 1318, 1324 (Fed. Cir. 2012); *Voda*

*v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (finding presence of

limiting language in some claims and absence of that language in other claims

"strongly implies" that the latter claims do not require the limitation); *Phillips*, 415

F.3d at 1324 (holding the "inclusion of such a specific limitation on the term

'baffles' in claim 2 makes it likely that the patentee did not contemplate that the

term 'baffles' already contained that limitation").

> ### 3. The District Court's Construction Relied on Language Taken Out of Context From the Prosecution History.

Third, even as it relates to Claim 3, Sunbeam's argument and the district

court's construction were incorrect, as they misapply language, devoid of context,

to conclude that Hamilton Beach used "horizontal" and "vertical" to limit the

planes of the "hook."  Nothing in Hamilton Beach's statements rises to the level of

"an unambiguous disavowal that clearly and unmistakably disclaims [the] claim

scope." *Grober*, 686 F.3d at 1342.  Because Hamilton Beach's arguments can be

reasonably interpreted not to claim only a particular "hook," those arguments

cannot support a prosecution disclaimer, or the district court's limiting construction

of "hook."  *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed.

Cir. 2005); *see also Golight*, 355 F.3d at 1333 (citing *Cordis Corp. v. Medtronic*

*AVE, Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003)).

"Claim 3 recites 'a housing having . . . a side wall . . . defining an opening' and 'a lid' for covering 'the opening.'" *Id.* As Hamilton Beach explained, "the side wall 20b *generally* defines a first plane (i.e., vertical plane) and the lid 40 *generally* defines a second plane (i.e., horizontal plane)." *Id.* (emphasis added). Moreover, Claim 3's modification – a "hook being shaped to extend from the lever and around the container rim" – implicitly requires a hook that, unlike Sprague's single-plane hook, "*is structurally in two different planes (i.e., a generally vertical plane defined by the side wall of the housing and a generally horizontal plane defined by the lid* for covering an opening of a container within the housing)." A2501 (emphasis added).

It is one thing to distinguish the hook from Sprague on the ground that it spanned *two* planes (one defined by the side wall and another defined by the lid). It is something else to suggest this distinction also clearly and unmistakably limited the hook in Claim 3 (let alone throughout the '928 patent) to one lying at least partially in both perfectly vertical and horizontal planes. The precise location or angle of the second plane relative to the first plane was inconsequential during prosecution.

Though presumably derived from arguments made in the prosecution history, the district court's construction of "hook" ignores the crucial context of those arguments. As in *Grober*, the district court made the mistake of "improperly

-27-

emphasiz[ing] a general statement out of context to limit the disputed claim term." *Grober*, 686 F.3d at 1343. Significantly, the court's construction cannot be reconciled with the use of the word "generally" to describe the two planes of the hook: "i.e., a *generally* vertical plane defined by the side wall of the housing and a *generally* horizontal plane defined by the lid for covering an opening of the container within the housing." A2501 (emphasis added); *see also Anchor Wall Sys.*, 340 F.3d at 1310-11 (construing "generally parallel" not to require exact parallelism and to envision some amount of deviation from exactly parallel). Nor can it be reconciled with the figures of the '928 patent, which clearly demonstrate that the "generally" horizontal plane defined by the lid is not perfectly flat, but rather, slopes upward toward the center of the lid, as lids commonly do. A77-78. For the hook to lie, at least partially, in a *generally* horizontal plane defined by lid, it cannot do so *perfectly* horizontally where the lid is not completely flat.

Read in its entirety, Hamilton Beach's response did not use "vertical" and "horizontal" in a normative sense to limit the "hook." Rather, those terms were simple shorthand for the planes defined by the side wall and lid, respectively. The district court's requirement that the "hook" extend or lie in both the vertical and horizontal planes, without reference to the side wall or the lid, improperly strips the terms "vertical" and "horizontal" from that context.

II.    **THE DISTRICT COURT'S ERRONEOUS SUMMARY JUDGMENT OF NON-INFRINGEMENT IS ROOTED IN FLAWED CONSTRUCTIONS OF "HOOK" AND "AROUND THE CONTAINER RIM."**

On summary judgment, the district court applied its erroneous construction of "hook" during its literal infringement analysis. It also implicitly and incorrectly construed the phrase "hook . . . . shaped to extend from the lever and around the container rim" to require the hook to traverse the *entire width* of the container rim. Based upon these mistaken constructions, the district court concluded that Sunbeam's slow cooker did not infringe the '928 patent because it did not have a "hook," and did not have a "hook . . . shaped to extend from the lever and around the container rim." Those incorrect decisions are reviewed *de novo*. *Anchor Wall Sys.*, 340 F.3d at 1306. Using the plain and ordinary meanings of "hook" and "around the container rim," it is for a jury to decide whether Sunbeam's slow cooker literally infringes.

A.    **Sunbeam's Cook & Carry Has a "Hook" Under that Term's Plain and Ordinary Meaning.**

"A literal patent infringement analysis involves two steps: the proper construction of the asserted claim and a determination as to whether the accused method or product infringes the asserted claim as properly construed." *Vitronics*, 90 F.3d at 1581-1582. The district court erred in both steps.

According to the district court, no reasonable juror could find that the Cook & Carry contained a "hook" simultaneously extending in a "vertical" and

"horizontal" plane when in the closed or locked position. A31. Had the district court properly afforded "hook" its plain and ordinary meaning, it could not have granted summary judgment, as Sunbeam's slow cooker unquestionably features what one would consider a "hook." It has a lever, a hook or wire element, and a catch:





The clip's wire component is curved to catch and hold the "catch" mounted on the side wall; simply put, it is a "hook." Properly construed, the "hook" element of each asserted claim of the '928 patent is present in Sunbeam's Cook & Carry.

Sunbeam initially admitted as much in the district court. Its Claim Chart acknowledged that its Cook & Carry has a "hook," A2129-30, and its expert witness testified at a preliminary injunction hearing that Sunbeam's slow cooker

has a "hook." A2206-10 (191:23 -195:2). Though the district court discounted the relevance of such admissions (made as they were before the court construed the patent),[4] the mere fact that Sunbeam and its expert acknowledged the presence of a "hook" creates a genuine dispute of material fact as to the presence of a "hook" in the accused product.

**B.    Sunbeam's Device Contains a "Hook. . . Shaped to Extend from the Lever and Around the Container Rim."**

The district court further erred in its infringement analysis by misconstruing and misapplying the phrase "shaped to extend from the lever and around the container rim," found in independent Claim 3 and dependent Claims 4 and 7. Though the district court did not construe the term in its claim construction order,[5] it implicitly construed the phrase "around the container rim" in its summary judgment decision. The district court held that no reasonable juror could find that Sunbeam's slow cooker meets the "hook . . . shaped to extend from the lever and around the container rim" limitation present in Claims 3, 4, and 7, "because its wire element stops well short of the ledge adjacent to the container opening."

---

[4] To the district court, these admissions did not concede that Sunbeam's product included a "hook" as defined by the court. A29. This, too, was error: Sunbeam's expert testified that he used his definitions in comparing the claim terms to the Cook & Carry, and his operative definition of the term "hook" was later adopted by the district court. A2206-10 (191:23 -195:2).

[5] The district court refused to construe the term, suggesting that it was content to apply the language's plain and ordinary meaning. A19-20.

A33-34.  Thus, to the district court, to go "around the container rim" the hook must traverse the entire width of the container rim or all parts of the container rim.  *Id.* This limiting construction of "around the container rim," is contrary to the plain meaning of the claim language and lacks support in the intrinsic record.

Like "hook," the plain meaning of "around" in the phrase "around the container rim" is again straightforward.  "[A]round the container rim" describes the shape the hook must have to reach the catch, not the distance it must travel up the lid.  A86 (col. 9, ln. 13-15 ("the hook being *shaped* to extend from the lever and around the container rim") (emphasis added), col 10, ln. 35-37("the hook of each over-the-center clip is *shaped* to extend from the lever and around the container rim") (emphasis added).  All that is required is that the hook be *shaped* to bypass or avoid the container rim, so that it can properly engage both the lever and the catch and seal the lid.

"Around" simply means that the hook must be curved to bypass the container rim.  Because the container rim lies directly between the catch on the lid or the side wall and the point where the hook engages the lever, it would prevent a straight hook from engaging with the catch.  As Hamilton Beach's technical expert stated, "the hook [must] extend from the lever around the container rim; if the hook did not extend around the container rim and was in a single plane, the container rim would be directly in the line of action of the hook and the clip would not be

engageable due to interference." A2665. Nothing in the language of Claims 3, 4 or 7 indicates that "*around* the container rim" is a limiting term requiring the hook to traverse the entire distance of the container rim or extend past all parts of the rim. The district court erred by reading such a limitation into the claims.

Nor does the specification support the district court's limiting construction. Indeed, the only statement in the specification of the '928 patent that addresses "around the container rim" confirms that the phrase is only used to describe the hook's shape:

> The at least one clip 22 is preferably attached to the side wall 20b of the housing 20, proximate the top thereof, with *the hook 22a shaped to be extendable from the lever 22b and around the container rim 30b* when the container 30 is disposed within the heating cavity 20c of the housing 20.

A84 (col. 5, ln. 18-23) (emphasis added). The figures of the '928 patent similarly do not support such a definition of "around." Figures 1-3 depict the hook in the closed position, none clearly depicts the hook traversing the entire distance of the container rim. This is not evidence that the inventors intended to act as their own lexicographers and imbue "around" with the specialized meaning assigned by the district court. *Vitronics*, 90 F.3d at 1582.

The prosecution history does not support the district court's construction either. Hamilton Beach explained that because its hook was "*shaped* to extend around the container rim," it necessarily spanned two planes, unlike Sprague's

single-plane hook.  *See supra* Section I.B.2., 3 (emphasis added).  That argument about shape never suggested that "around" somehow required a hook of a particular *size* or *length*.  A2500-01.

The phrase "shaped to extend from the lever and around the container rim" should be given its plain and ordinary meaning.  As used in Claim 3, the phrase claims a hook shaped to bypass or avoid the container rim and properly engage both the lever and the catch – one that must get *around* that part of the container rim that sits between lever and catch.  The district court's construction was erroneous and should be vacated.

Based on that incorrect construction, the district court was equally wrong to find that Sunbeam's slow cooker did not literally infringe the '928 patent because its wire element stopped "short of the ledge adjacent to the container opening" – i.e., it lacked a hook going "around the container rim."   A33-34.  As Hamilton Beach's technical expert would testify at trial, A2664-65, and as is readily apparent from a cursory inspection of the infringing device, Sunbeam's hook is shaped to extend from the lever and around the container rim, which it bypasses to reach the catch.



Because there are at least sufficient grounds for reasonable jurors to find literal infringement, the court erred in granting summary judgment of noninfringement.

## III.   THE DISTRICT COURT ERRED IN INVALIDATING THE '928 PATENT FOR CONTAINING NEW MATTER.

Since patents are presumed valid, 35 U.S.C. § 282(a), the burden of establishing that a patent is invalid rests on the party asserting invalidity. *Id.* That "heavy burden of persuasion" can only be carried by establishing facts supporting invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship,* 131 S. Ct. 2238, 2245 (2011); *Proctor & Gamble Co. v. Teva Pharms. USA, Inc.,* 566 F.3d 989, 993-94 (Fed. Cir. 2009). Clear and convincing evidence is that which "places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" *Proctor & Gamble,* 566 F.3d at 994 (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316 (1984)). Accordingly, Sunbeam bears the heavy burden to establish clear and convincing evidence that the '928 patent

contained new matter not supported by the original-filed specification of the '831 patent and was anticipated by prior art.

On this issue, the parties' summary judgment motions crossed. The district court held that the '928 patent contained new matter on two grounds: (1) that the '928 patent contained a new definition for the term "clip"; and (2) that the '831 patent did not disclose a slow cooker that had a catch mounted to the side wall, as claimed in the '928 patent. A42. The court further found that the '928 patent was anticipated by the Stay or Go® and Cook & Carry slow cookers. A44-45. The district court therefore granted Sunbeam's motion, a decision reviewed *de novo*. *See Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011) (holding that summary judgment regarding compliance with written description requirement is reviewed *de novo*). The court's denial of Hamilton Beach's motion on this issue is reviewed for abuse of discretion. *SunTiger, Inc. v. Scientific Research Funding Grp.*, 189 F.3d 1327, 1333 (Fed. Cir. 1999).

The district court's new matter analysis improperly required Hamilton Beach to prove that the '928 patent did not contain new matter and ignored substantial evidence gutting Sunbeam's defense.

A.     **The District Court Incorrectly Required Hamilton Beach to Establish Priority, Misapplying the Burden of Persuasion on Invalidity Based on New Matter.**

The district court erroneously held that because "neither the PTO nor the Board of Patent Appeals made a priority determination [with regard to the '928 patent], it is Hamilton Beach's burden to establish *priority* to the filing date of the '831 application." A38. Finding Hamilton Beach's arguments "unpersuasive," the district court concluded that "Hamilton Beach *cannot meet its burden to establish priority* to the filing date of the '831 application." A42, A44 (emphasis added). And "[w]ith the priority issue settled, Sunbeam's burden to prove invalidity by clear and convincing evidence is a *fait accompli*," said the district court, since Hamilton Beach sold Stay or Go® slow cookers – which embody the '928 patent – before it filed the '928 patent application. A44.

The district court's approach, which turns the burden of persuasion on its head, is rooted in its misapprehension of *PowerOasis v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir. 2008). Contrary to the district court's holding, *PowerOasis* does not make it Hamilton Beach's burden to establish that the '928 patent was entitled to the filing date of the '831 patent. This is clear from this Court's later discussion in *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1328-29 (Fed. Cir. 2008).

Among the issues raised in *Videotek* was the allocation of burdens of proof in a dispute over the priority date of a continuation patent. *Id.* at 1326. This Court decided that *PowerOasis* did not change the traditional burdens of persuasion and production in patent validity challenges involving disputes over priority dates. *Id.* at 1328-29. This Court reaffirmed that "[w]hen an alleged infringer attacks the validity of an issued patent, our well-established law places the burden of persuasion on the attacker to prove invalidity by clear and convincing evidence." *Id.* at 1327.

The alleged infringer must first offer evidence that the patent is anticipated by prior art that predates the later-filed patent's application date. *Id.* Only then must the patentee produce evidence that the alleged prior art is not anticipating, or that the patent is entitled to a filing date before the alleged prior art. *Id.* But that is only a burden of production. *Id.* Once the patentee's evidence is before the court, "the burden of going forward again shifts to the proponent of the invalidity defense . . . *to convince the court* that [the patentee] is not entitled to the benefit of the earlier filing date." *Id.* at 1328 (emphasis added). Moreover, whatever determination the PTO may have made about priority dates has no bearing on these shifting burdens or the alleged infringer's ultimate burden to demonstrate invalidity by clear and convincing evidence. *Id.* at 1328-29; *see also Microsoft*, 131 S. Ct. at 2249-50 (affirming that clear and convincing evidence standard

-38-

applies to all invalidity challenges, regardless of whether the basis for invalidity had been explicitly addressed by the PTO).  The ultimate burden of persuasion to demonstrate invalidity by clear and convincing evidence "never shifts, however much the burden of going forward [with evidence] may jump from one party to another as the issues in the case are raised and developed."  *Videotek*, 545 F.3d at 1329.

Accordingly, as the party asserting an invalidity defense, Sunbeam had both the initial burden of production and the ultimate burden of persuasion to demonstrate by clear and convincing evidence that the '928 patent contained new matter.  *Videotek*, 545 F.3d at 1327.  Once Sunbeam carried its initial burden of production, *Videotek* required Hamilton Beach to offer some evidence that the claims of the '928 patent are entitled to the filing date of the '831 patent because the original disclosure of the '831 patent sufficiently discloses the invention claimed in the '928 patent.  *Id.* at 1328.  Once Hamilton Beach did that, with the preferred embodiment language, expert testimony, inventor testimony and documentary evidence discussed in Section III.B., *infra*, it was Sunbeam's burden "to *convince* the court that [the '928 patent] is not entitled to the benefit of the earlier filing date."  *Videotek*, 545 F.3d at 1328 (emphasis added).  Sunbeam's ultimate burden of persuasion to demonstrate invalidity by clear and convincing evidence "never shifts."  *Id.* at 1329.  And given the record, that burden was never,

as the district court put it, "a *fait accompli*."  A44.  Sunbeam bore the burden, at all times, to demonstrate by *clear and convincing* evidence that the '928 patent contained new matter.  The district court's incorrect application of the burdens of proof alone warrants reversal of its new matter ruling.

### B.    The District Court Disregarded Substantial Evidence that Created a Genuine Issue of Material Fact with Regard to New Matter.

The district court committed another fundamental error by not viewing the evidence in the light most favorable to Hamilton Beach and by ignoring substantial evidence that, at the very least, creates a genuine issue of material fact precluding summary judgment on Sunbeam's new matter defense.

Sunbeam's defense asks "whether the specification of the original application contained a written description of the invention sufficient to allow persons of ordinary skill in the art to recognize that the inventor invented the subject matter that is claimed in the asserted claims." *Commonwealth Scientific. & Indus. Research Org. v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363,1379 (Fed. Cir. 2008).   An original-filed specification "need not provide *in haec verba* support for the claimed subject matter at issue" to satisfy the written description requirement of § 112.  *See Lampi Corp. v. Am. Power Prods.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000).  "In other words, the earlier application need not describe the claimed subject matter in precisely the same terms as found in the claims at issue." *Martek*

*Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1369 (Fed. Cir. 2009) (quotations and citation omitted).

To the district court, the '928 patent contained new matter because it (1) changed the definition of the term "clip" from the '831 patent; and (2) did not disclose a configuration in which the catch could be mounted on the side wall of the housing.  A42.  Specifically, the district court concluded that the '831 patent disclosed "clips" including a hook and a lever, but not a catch, while the '928 patent disclosed "clips" that include a hook and a catch.  *Id.*  The district court never explained or cited any facts showing how this purported definitional change improperly broadened the scope of the invention disclosed in the '831 patent, such that the '928 patent contained "new matter."  In essence, the district court's inquiry into the definition of clips stopped with its conclusion there was something different in the '928 patent, never bothering to determine whether one of ordinary skill in the art would see in the '831 patent that the inventors invented the subject matter claimed in the '928 patent.

How Hamilton Beach defined "clip" in its patents is not the test of whether it added new matter in the '928 patent; the definition of "clip" is not even probative. The original disclosure of the '831 patent discloses a hook, lever, and, notably, a catch – all intended to work together.  A2599 (ln. 30-31) – A2600 (ln. 1), A71 (col. 5, ln. 17-20) ("The at least one clip 22 is a generally conventional over-the-center

-41-

clip having a hook 22a and a lever 22b, such that manipulation of the lever 22b causes engagement or release of the hook 22a of the clip 22."); A2600 (ln. 10-12), A71 (col. 5, ln. 34-38) ("It is preferred that the lid 40 includes *at least one catch 42a* in the form of a small, slightly hooked, elongate protrusion extending outwardly from the lid 40 *to selectively engage the hook22a of the clip 22*.") (emphasis added); A2600 (ln. 19-21), A71 (col. 5, ln. 47-51) ("*When the hook 22a is placed around the catch 42a*, the lever 22b of the clip 22 can be rotated downwardly and inwardly toward the side wall 20b of the housing 20 to create a retaining force exerted by the clip 22 on the lid 40 in order to retain the lid 40 on the container rim 30b.") (emphasis added).  Whether "clip" describes the hook and lever or the hook, lever and catch, does not affect the scope of the patents.  The district court's focus on the red herring "clip" analysis distracts from the real question raised by Sunbeam's new matter defense – does the original disclosure of '831 patent contain a written description of the invention sufficient to allow one of ordinary skill in the art to recognize that the inventors invented a slow cooker that could have a catch located either on the lid or on the side wall of its housing? *Commonwealth Scientific*, 542 F.3d at 1379.

In concluding that the '831 patent did not disclose that the catch could be located on the side wall, the district court ignored substantial contrary evidence, including the critical preferred embodiment language in the '831 patent's original

specification.  A43-44.  The original disclosure of the '222 application states that "[t]he at least one clip 22 is *preferably* attached to the side wall 20b of the housing 20 . . ." and "[i]t is *preferred* that the lid 40 includes at least one catch 42a in the form of a small, slightly hooked elongate protrusion . . . ."  A2600 (ln. 1-2, 10-12), A71 (col. 5, ln.20-21, 34-36) (emphasis added).  This use of "preferred" strongly indicates that the hook and lever and the catch could be mounted elsewhere on the slow cooker beside the side wall and lid, respectively.  *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1326 (Fed. Cir. 2008) (emphasizing phrases such as "the preferred structure" and "the most preferred form" indicated that uniformity of the capillary tubes in the invention was "a feature only of certain embodiments, and not of all embodiments, of the invention"); *E-Pass Techs., Inc. v. 3COM Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003) (finding that the use of words such as "usual" and "normally" "suggest a preferred aspect of the invention subject to variability rather than a precise definition"); *Cordis Corp.*, 339 F.3d at 1357 ("The use of the term 'preferably' makes clear that the language describes a preferred embodiment, not the invention as a whole.").

As a general rule, "the claims of a patent are not limited to the preferred embodiment, unless by their own language."  *Karlin Tech.*, 177 F.3d at 973.  The claims of a patent may be broader than the preferred embodiment disclosed in the original-filed specification without violating the new matter or written description

requirements of § 112.  *Id.*; *see also Martek Biosciences Corp.*, 579 F.3d at 1371

("a patent claim is not necessarily invalid for lack of written description just

because it is broader than the specific examples disclosed"); *cf. Bilstad v.

Wakalopulos*, 386 F.3d 1116, 1123 (Fed. Cir. 2004) (discussing "general rule that

disclosure of a species provides sufficient written description support for a later

filed claim directed to the genus").  The disclosure of the preferred location for the

clip and the catch in the original-filed '831 specification, then, did not limit the

invention disclosed to a single embodiment having a clip on the side wall and the

catch on the lid.

Rather than address that preferred embodiment language discussing the

*location* of the clip or catch, the district court focused on language directed to the

catch's configuration.  A44.  While it is true that the '831 patent "indicates that the

catch need not be integrated with the handle and might be shaped differently," that

language is irrelevant to the new matter issue.  What was relevant – and what was

overlooked by the district court – was the preferred embodiment language

discussing the location of the clip and catch.

The district court also improperly ignored key differences between Claims 5

and 6 of the '831 patent, which were originally Claims 7 and 8 in the '222

application.  Under the doctrine of claim differentiation "different words or phrases

used in separate claims are presumed to indicate that the claims have different

Confidential information subject to the parties' Protective Order
has been redacted on this page.

meanings and scope." *Karlin Tech., Inc.*, 177 F.3d at 971-972. The presumption

created by claim differentiation can only be "overcome by strong contrary

evidence such as definitional language in the patent or a clear disavowal of claim

scope, neither type of contrary evidence is present here." *InterDigital Commc'ns.*,

690 F.3d at 1324. Claim 5 of the '831 patent claims a slow cooker that "includes

at least one clip for selectively retaining the lid in sealing engagement with the

container rim to inhibit leakage of the food stuffs from the interior of the

container." A72 (col. 8, ln. 49-52); A2605 (ln. 27-29). Claim 6 claims the slow

cooker of Claim 5 "wherein the at least one clip is attached to the side wall of the

housing." A72 (col. 8, ln. 53-54); A2605 (ln. 30-31) – A2606 (ln. 1-3). Thus,

while Claim 6 requires a clip on the side wall of the housing, the broader Claim 5

does not. In fact, the most logical location of the hook and lever, other than the

side wall, is the lid.[6] These claims are presumptively different, and a contrary

reading improperly renders superfluous the location limitation in Claim 6. *See*

*Arlington Indus.*, 632 F.3d at 1254-55 (holding that importing a "split" limitation

into claims improperly discounts substantive differences between the claims and

would render the modifier "split" superfluous where that term did not appear in the

claims at issue, but did in parent patent's claims); *Voda*, 536 F.3d at 1320 (finding

---

[6]

]. A5062-63 (246:2- 247:15).

that where two claims required the contact portion of the catheter to have a "substantially straight leg," the absence of this language in other claims "strongly implies" that those other claims do not require the contact portion of the catheter to be straight).

Sunbeam offered nothing to overcome the presumptive difference in claim scope, and nothing sufficient to show that one of ordinary skill in the art would have understood the '928 patent to disclose new matter.  Sunbeam simply cited the conclusory opinion of its expert, who regurgitated Sunbeam's misplaced legal arguments regarding the definition of "clip" in the '831 and '928 patents.  A2172 at ¶ 16; A2188-89 at ¶¶ 45-46.  Tellingly, he never opined why any purported changes to the definition would affect the scope of the invention disclosed in the '831 patent or would be considered new matter by one of ordinary skill in the art. Nor could he, having admitted that he did not know the standard for assessing whether a change constitutes new matter or whether a disclosure supports a particular claim.  A2214 (213:2-9).  He also never opined that the specification of the '831 application did not sufficiently describe the invention so as to allow one of ordinary skill in the art to recognize that Hamilton Beach invented the invention claimed in the '928 patent.  A2172 at ¶ 16; A2188-89 at ¶¶ 45-46.

In addition to the original disclosure of the '831 patent, the uncontroverted extrinsic evidence – some of which the district court discounted, some of which it

simply ignored – conclusively demonstrates that the original specification of the '831 patent sufficiently disclosed the invention claimed in the '928 patent:

- Hamilton Beach's technical expert painstakingly set forth how each element of the claims of the '928 patent was supported in the original disclosure of the '831 patent, A3149-53.

- a named inventor in the '928 patent testified that Hamilton Beach's development team discussed the merits of attaching over-the-center clips to a slow cooker lid in October 2004, establishing that they had invented the subject matter of the '928 patent before filing the '831 application, A2617 (221:4-25).[7]

- another named inventor testified that she created concepts with clips on the side wall and with clips on the lid, A2622 (99:10-22).

- a June 2004[8] Hamilton Beach design concepts presentation discloses slow cooker concepts with hooks mounted on the lid and catches mounted on the side wall, A4859-67.

---

[7] The team decided to attach the moving parts of the clip to the side wall because the base of the slow cooker was less likely to get dirty than the lid. A2618-19 (225:15-226:11.)

[8] Hamilton Beach filed its '222 application on March 1, 2005.

- Hamilton Beach employees discussed in August 2004 that future versions of its under-development slow cooker could feature clips on the lid, A4856.

The district court erred by not addressing this evidence, even though it is strongly probative proof that the '928 patent does not contain new matter. *See Commonwealth Scientific.*, 542 F.3d at 1382 (affirming finding of no new matter based in part on inventors' testimony that they were in possession of and had described the invention claimed in a later patent in the original disclosure); *SunTiger*, 189 F.3d at 1333 (affirming denial of summary judgment on written description grounds where the patentee submitted expert affidavits and defendant submitted evidence to rebut those affidavits, creating genuine issue of material fact). Given that it is Sunbeam's burden to establish its new matter defense by clear and convincing evidence, given the substantial evidence put forth by Hamilton Beach, and given Sunbeam's wholesale failure to offer relevant evidence on this issue, the district court erred by granting Sunbeam summary judgment.

Moreover, the court abused its discretion by not granting Hamilton Beach's motion for summary judgment on Sunbeam's new matter defense. The only evidence offered by Sunbeam was its expert's conclusory opinion, which, lacking factual support, does not raise a genuine issue of material fact. *See Upjohn Co. v. MOVA Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000) (citing *Motorola, Inc.*

-48-

Confidential information subject to the parties' Protective Order
has been redacted on this page.

*v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997)).  Accordingly,

the district court should have granted Hamilton Beach's motion for summary

judgment on new matter.

**V.    The District Court Erroneously Found the '928 Patent Invalid Under
the On-Sale Bar.**

The district court held that the '928 patent was invalid under the on-sale bar

of 35 U.S.C. § 102(b).  The court's decision was based upon an incorrect factual

finding, hotly disputed by Hamilton Beach, that Hamilton Beach's [ █████ ]

supplier accepted Hamilton Beach's February 8, 2005 Purchase Order for a

product practicing the claimed invention before the March 1, 2005 critical date for

the '928 application.  To reach this conclusion the district court misapplied the on-

sale bar, failed to perform the required analysis to determine whether the product at

issue fully anticipated the '928 patent, and ignored substantial evidence favoring

Hamilton Beach.

"An accused infringer, challenging a presumptively valid patent . . . must

demonstrate by clear and convincing evidence that there was a definite sale or offer

to sell more than one year before the application for the subject patent, and that the

subject matter of the sale or offer to sell fully anticipated the claimed invention."

*Group One, Ltd. V. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045-46 (Fed. Cir. 2001)

(quotations and citation omitted).  "Application of the on-sale bar is a question of

law, and [this Court] review[s] the district court's ultimate conclusion of invalidity

without deference." *Id.* at 1045. Similarly, the district court's grant of summary judgment is reviewed *de novo*. *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1375 (Fed. Cir. 2002).

### A.    The District Court Failed to Determine Whether the Product at Issue Met All of the Elements of the Asserted Claims.

The district court's first task was to "determine 'whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention.'" *Dana Corp.*, 279 F.3d at 1375 (quoting *Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383 (Fed. Cir. 1999)); *see also Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1572 (Fed. Cir. 1986) (finding reversal of order granting JNOV appropriate in part because substantial evidence supported jury's finding that a claimed element of the patent in suit was missing in the product at issue). In making this determination, a court must properly construe the claims of the patent at issue and "make specific findings linking elements of the [product at issue] to claim limitations of the [patent]." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1355 (Fed. Cir. 2002). Not to do so is reversible error. *See Dana Corp.*, 279 F.3d at 1375 (holding district court erred in granting summary judgment of invalidity under on-sale bar without applying properly construed claims to the alleged prior invalidating acts); *Scaltech*, 178 F.3d at 1383-84 (reversing invalidity finding because district court did not address whether the subject of the barring activity met each claims'

-50-

Confidential information subject to the parties' Protective Order
has been redacted on this page.

limitations); *see also Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737-38

(Fed. Cir. 2002) (reversing jury finding of invalidity under § 102(b)'s public use

bar because there was no substantial evidence that the products at issue practiced

all elements of the asserted claims).

Instead of conducting the required element-by-element analysis of the

product in the Purchase Order, the district court simply concluded that the

Purchase Order cited a model number corresponding to what ultimately became the

Stay or Go® slow cooker, "which would inherently satisfy each claim limitation of

the '928 patent." A51. The deposition testimony and exhibit cited by the district

court on this point do nothing more than indicate that Hamilton Beach used the

same model number in development of its new product; none of that evidence

addressed whether, when the Purchase Order issued, the product in development

then met each claim limitation of the '928 patent. By simply presuming that it did,

the district court assumed the jury's function, ignoring its obligations under this

Court's precedents and Rule 56.

Had the district court conducted the proper analysis, it would have found

substantial evidence that, when the Purchase Order was sent, Hamilton Beach's

proposed slow cooker did not meet a critical claim element of the '928 patent.

Simply put, [██████████████████████████████████████

████████████████], and could not "selectively retain the lid in sealing

-51-

Case: 12-1581    Document: 34    Page: 63    Filed: 10/09/2012

engagement with the container rim to inhibit leakage of the food stuffs from the interior of the container." A85 (col. 8, ln. 41-44); A86 (col. 9, ln. 18-20) (col. 10, ln. 26-28); *see* A4915; A5002-03 [█████████████████████████████████ ███████████████████].

Even after the Purchase Order, the [█████████████████████████████ ████████████████████████████████████████]. A4924-25 (137:7-138:24); A4915; A5002-03; A5005-07. Still [████████████████ ████████████████████████████████████████████████████ ███████████]. A5005-07. [████████████████████████████████ ████████████████████]. A5005.

From this evidence, the district court reasonably could have (and, on summary judgment should have) inferred in Hamilton Beach's favor that the product in the Purchase Order did not fully anticipate the claims of the '928 patent [████████████████████████████████████████████████ ████████████████████████████████████████] The district court erred by not making this inference and by simply assuming, based on the assignment of a model number, that the product practiced each element of the claims of the '928 patent.

Confidential information subject to the parties' Protective Order
has been redacted on this page.

### B. The District Court Improperly Resolved Disputes of Material Fact and Drew Inferences Against the Non-Moving Party in Finding There Was a Commercial Offer for Sale.

The district court also erred in declaring it a proven fact that [ ▮ ] accepted Hamilton Beach's offer to buy the product at issue more than one year before the application date of the '928 patent. Again usurping the jury's function, the district court found "sufficient evidence of an objective manifestation of assent on the part of [ ▮ ], and of an invalidating sale under § 102(b)." A54. First, that finding is not supported at all by the summary judgment record. Second, even if the record did contain "sufficient evidence of an objective manifestation of assent," it also contained contrary evidence. Hamilton Beach submitted substantial evidence that, at a minimum, raised a genuine issue of material fact and should have precluded an award of summary judgment to Sunbeam.

In an on-sale bar analysis, a court must determine whether an offer to buy was accepted before the critical date, forming a binding contract before the critical date. *See Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1052-53 (Fed. Cir. 2001) (holding that question for on-sale bar analysis was whether a party accepted purchase orders that contained offers to buy thereby creating a binding contract). Under general contract law, an offer to buy must be accepted by an objective manifestation of assent. *Id.* at 1053. Thus, the question for the district court was whether, after drawing all reasonable inferences in favor of Hamilton Beach, there

-53-

Confidential information subject to the parties' Protective Order
has been redacted on this page.

was a genuine issue of material fact as to whether [          ] had *objectively assented*

to Hamilton Beach's Purchase Order, and the parties had thereby entered into a

binding contract. *See Group One.*, 254 F.3d at 1045 (citing *Anderson v. Liberty*

*Lobby*, 477 U.S. 242, 255 (1986)); *Micrel*, 275 F.3d at 1052-53.

As an initial matter, the district court found that Hamilton Beach made a

commercial offer to buy the product at issue when it issued the Purchase Order.

A51. Under general principles of contract law, "[a]n offer is the manifestation of

willingness to enter into a bargain, so made as to justify another person in

understanding that his assent to that bargain is invited and will conclude it."

*Micrel*, 275 F.3d at 1050 (quoting *Restatement (Second) of Contracts* § 24 (1981)).

On the other hand, "[a] manifestation of willingness to enter into a bargain is not

an offer if the person to whom it is addressed knows or has reason to know that the

person making it does not intend to conclude a bargain until he has made a further

manifestation of assent." *Id.* (quoting *Restatement (Second) of Contracts* § 26

(1981)).

But, [          ] knew or should have known that Hamilton Beach did not

intend to conclude a bargain for the purchase of the product at issue under the

terms of the Purchase Order and the parties' governing corporate purchase

agreement. A5194-218. [

]

-54-

Confidential information subject to the parties' Protective Order
has been redacted on this page.

███████████████████████████████████████████ ] A5211.  In fact,

in the email relied upon by the district court, dated just four days before the critical

date, [██████████████████████████████████████████████

██████████████████████████ ].  A4002.[9]  Accordingly, under general

contract law, the Purchase Order did not constitute an "offer" because it required

Hamilton Beach to make "a further manifestation of assent" – [████████████ ]

– before concluding any bargain between the parties.

   Even if the Purchase Order was an offer, there is a considerable weight of

evidence – certainly enough to prevent summary judgment – that it was not

accepted before the critical date.  The Purchase Order was automatically generated

by Hamilton Beach's project management software, not as a result of customer

demand or projections.  A4975.  The [██████████████████████

█████████████████████████████████████████

█████████████████████████████████

██████████████████████ ].  A4977-78; A4981-83.

[████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████ .]

---
[9] ████████████████████████████████████████

█████████████████████████████ .  A5005-07.

Confidential information subject to the parties' Protective Order has been redacted on this page.

A4991-96. []. A4994-96.[10]  More importantly, [■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■]. A4991.  These uncertainties make a mockery of the district court's conclusion that Sunbeam was entitled to summary judgment; the last document alone raises a genuine issue of material fact as to whether [■■■■■■] accepted the purchase order before the critical date.

Moreover, the district court also ignored evidence that Hamilton Beach would not contract to buy a new product to sell to its customers [■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■]. A4883-84 (217:7-218:22); A4891-92 (275:6-276:3).  Hamilton Beach would not sell a new product without knowing that it was safe and would receive UL approval.  A4891-92 (275:6-276:3).  None of these prerequisites had been met when the Purchase Order issued; UL testing ended more than two months after the critical date.  A5127-33.  Viewing the evidence as a whole in the light most favorable to Hamilton Beach, the reasonable inference must be that Hamilton Beach would not have committed to purchase some [■■■■■■] of a product that

---

[10] And, as noted above, *see supra* Section V.A., since Hamilton Beach had yet to solve the leakage problem (and would not for several more months), even the basic nature of the product was to change dramatically.

Confidential information subject to the parties' Protective Order
has been redacted on this page.

[██████████████████████████████████████████

██████████████████████████████████████████ ], with a UL

listing mark.

By not viewing the evidence in the light most favorable to Hamilton Beach,

the district court made a fundamental error.  Nothing makes this clearer than the

email cited by the district court as evidence of [████████] acceptance.  A52.  In

that email, [████████████████████████████████████

██████████████████████████ ]. *Id.*  The district court,

however, ignored this language in its discussion and construed the email in

Sunbeam's favor.  A52-54.

This Court has reversed on-sale bar rulings for similar errors.  In *Monon

Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253 (Fed. Cir. 2001), this Court

reversed an award of summary judgment of invalidity under the on-sale bar.

Though there was competing testimony on the issue, the district court had resolved

disputed facts against the non-moving party, and granted summary judgment of

invalidity to the defendant.  *Id.* at 1260.  This Court reversed, noting that

"[b]ecause the on-sale bar issue was resolved at the summary judgment stage, the

trial court was obliged to view the evidence in the light most favorable to the non-

movant, Monon," and finding that "[t]he trial court appears to have erred in failing

to do so." *Id.*

*Orthokinetics* involved a similar analysis, albeit over a motion for judgment notwithstanding the verdict. The district court overturned a verdict for the patentee on the defendant's on-sale bar defense, focusing on evidence supporting the moving party and dismissing evidence supporting the jury's finding as "ambiguous." 806 F.2d at 1572. This Court reversed, chiding the district court for "virtual disregard of substantial evidence on which the jury could reasonably have reached a contrary determination." *Id.* In dismissing evidence supporting the non-moving party as "ambiguous," "the district court lost sight of the rules, i.e., that resolution of ambiguities (assuming they existed) is a role assigned the jury, and inferences are to be drawn in favor of the nonmovant." *Id.*

That is precisely what happened here. Just as in *Orthokinetics* and *Monon*, the district court disregarded substantial evidence supporting Hamilton Beach and resolved factual disputes in Sunbeam's favor. Those errors mandate reversal.

## CONCLUSION

This Court should (i) give the term "hook" in the '928 patent its plain and ordinary meaning; (ii) reverse the district court's summary judgment of non-infringement; (iii) reverse the district court's summary judgment of invalidity based on the addition of new matter; (iv) reverse the district court's denial of summary judgment on validity; (v) reverse the district court's summary judgment of invalidity based on the on-sale bar; and (vi) remand this matter for a jury trial.

## REQUEST FOR ORAL ARGUMENT

Hamilton Beach requests oral argument.

Respectfully submitted this 9th day of October, 2012.

/s/ Robert M. Tyler
Robert M. Tyler (VSB No. 37861)
Kristen M. Calleja (VSB No. 41319)
William N. Federspiel (VSB No. 76716)
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (Fax)
rtyler@mcguirewoods.com
kcalleja@mcguirewoods.com
wfederspiel@mcguirewoods.com

Attorneys for Appellant Hamilton Beach
Brands, Inc.

# ADDENDUM



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **HAMILTON BEACH BRANDS, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   Civil Action No. 3:11-cv-00345-JRS |
| | ) |
| **SUNBEAM PRODUCTS, INC.** | ) |
| **d/b/a JARDEN CONSUMER** | ) |
| **SOLUTIONS,** | ) |
| **Defendant.** | ) |
| | ) |

## AGREED PROTECTIVE ORDER

It is hereby stipulated and agreed by Plaintiff Hamilton Beach Brands, Inc., (hereinafter "Plaintiff") and Defendant Sunbeam Products Inc., d/b/a Jarden Consumer Solutions, (hereinafter "Defendant") through their respective counsel, that the terms and conditions of this Agreed Protective Order (hereinafter "Protective Order") shall govern all discovery taken pursuant to the Federal Rules of Civil Procedure as well as testimony adduced at trial, matters in evidence and any other information that either party designates as "Confidential Information" or "Highly Confidential Information" in the above-captioned civil action (hereinafter "Action").

Pursuant to the parties' stipulation and good cause appearing, IT IS HEREBY ORDERED:

## DEFINITIONS

1.      "PARTY" means the Plaintiff and the Defendant in this Action or any person or entity that later joins this Action, or third party that may produce documents or other materials, or provide testimony in this Action, and every director, officer, employee and managing agent thereof.

2.      "DISCOVERY MATERIAL" means any document (in any form, including specifically hard copy or computer readable form), thing, deposition testimony, interrogatory

answer, response to request for admission, response to request for production, or other information provided or produced as part of this Action.

3.     "DESIGNATING PARTY" or "PRODUCING PARTY" means the Party, or any other person or entity, providing or producing Discovery Material as part of this Action.

4.     "RECEIVING PARTY" means any and all Parties receiving Discovery Material as part of this Action.

5.     "CONFIDENTIAL" or "CONFIDENTIAL INFORMATION" means and includes any and all non-public Discovery Material that a Producing Party in good faith believes constitutes, contains, reveals, relates to, or reflects trade secrets, processes, operations, research, technical or development information or apparatus, production, marketing, sales, shipments, unpublished pending patent applications, know-how, or other proprietary or confidential trade secret, technical, business, financial, commercial, or personnel information.

6.     "HIGHLY     CONFIDENTIAL"     or     "HIGHLY     CONFIDENTIAL INFORMATION" means and includes any and all Confidential Information whose disclosure to any Receiving Party or any other entity would be likely to cause harm to the competitive position of the Producing Party.

7.     "ACCESS" means providing, making available, or disclosing an original or a copy of any Discovery Material to a Party or a Third Party, including a summary thereof.

**TERMS OF THE AGREED PROTECTIVE ORDER**

8.     Nothing herein shall impose any restriction on the use or disclosure by a Producing Party of its own documents, information, or Discovery Material.

9.     A Producing Party may in good faith designate Discovery Material as either Confidential or Highly Confidential at the time of its disclosure, production, or tender to a

Receiving Party, or at any other such time as may be permitted by this Protective Order. The inadvertent failure to designate Discovery Material as either Confidential Information or Highly Confidential Information does not constitute a waiver of such a claim; a Producing Party may so designate Discovery Material after such Discovery Material has been produced, with the effect that such Discovery Material is thereafter subject to the protections of this Protective Order.

10.     The designation of Discovery Material in the form of documents, responses to admissions, responses to interrogatories, or other tangible materials (including without limitation computer media, tapes, and the like), other than depositions or other pretrial testimony, shall be made by the Producing Party by conspicuously affixing the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" or such other equivalent language on each page containing any Confidential Information or Highly Confidential Information to which the designation applies. In the event a party produces Discovery Materials in electronic format (computer files in native electronic file format, as kept in the ordinary course of business) the Producing Party shall indicate by a reasonable method which specific electronic documents or files are designated Confidential or Highly Confidential.

11.     No Discovery Material shall be designated as Confidential or Highly Confidential that:

a)      Has been or becomes lawfully in the possession of a Receiving Party through communications other than production or disclosure in this Action, or in other litigation, for example, as a result of legitimate business dealings between the parties, unless the Discovery Information is covered by a separate non-disclosure or confidentiality agreement, in which case the Receiving Party may continue to use such documents in the course of its business subject to those agreements; or

Case 12-1581    Document 34    Page: 76    Filed: 10/09/2012

b)      Has been or becomes part of the public domain, for instance by publication, and not due to any unauthorized act or omission on the part of a Receiving Party or any of its authorized representatives or designees under this Protective Order.

12.     The Parties agree to restrict Access to Discovery Material designated as Confidential to the following Qualified Persons:

a)      Trial Counsel for Plaintiff, and their stenographic, clerical, paralegal, and other employees whose duties and responsibilities require Access to such Discovery Material;

b)      Trial Counsel for Defendant, and their stenographic, clerical, paralegal, and other employees whose duties and responsibilities require Access to such Discovery Material.

c)      A total of no more than three in-house attorneys ("In-House Counsel") of a Party whose names are listed below and who have responsibility for maintaining, defending, or evaluating this litigation and their stenographic, clerical, and paralegal employees whose duties and responsibilities require Access to such Discovery Material and who, prior to any such Access, have reviewed and agreed to comply with and be bound by this Order;

| NAME | PARTY |
|---|---|
| 1.) | Plaintiff |
| 2.) | Plaintiff |
| 3.) | Plaintiff |
| 1.) | Defendant |
| 2.) | Defendant |
| 3.) | Defendant |

4

d)      Retained independent consultants or experts for a Party (as well as their staff, stenographic, and clerical employees whose duties and responsibilities require Access to such materials), who are not current directors, officers, employees, or managing agents of any Party to this Action, any company related to a Party to this Action, or any direct competitor of any Party to this Action;

e)      Retained vendors, jury consultants, and mock jurors, who are not current directors, officers, employees, or managing agents of any Party to this Action, any company related to a Party to this Action, or any direct competitor of any Party to this Action;

f)      The Court, Court personnel, and stenographic and video reporters engaged in proceedings incident to this Action;

g)      Outside Discovery Material processing services, including document copying services, document coding services, and computerization services. Notwithstanding any other provision of this protective order, Access to Confidential Information shall be permitted to such service providers without need for the completion of Exhibit A or the execution of Exhibit B. The Party providing Confidential Information to an outside Discovery Material processing service shall be responsible for that service provider's compliance with the provisions of this Protective Order.

h)      Any person who is an author or recipient of, or who was authorized in the normal course of business to see, the Discovery Material.

i)      Any other person or entity whom the Parties agree in writing may receive Discovery Material designated as Confidential.

13.     The Parties agree to restrict Access to Discovery Material designated as Highly Confidential to the Qualified Persons defined in paragraphs 12(a), (b), and (d)-(i).

14.   Qualified Persons defined in paragraphs 12(d) shall be allowed Access to Confidential Information or Highly Confidential Information only after complying with the following procedure:

a)   Each Party shall prepare a written list, in a form similar to Exhibit A hereto, setting forth the name of the person, his or her occupation, and business address for each person described in paragraph 13(c) who is given access to Confidential Information or Highly Confidential Information. In addition, each Party shall submit to the Producing Party a curriculum vitae for each person so listed and described in paragraphs 13(c). A Party shall be allowed to disclose Confidential Information and/or Highly Confidential Information to such persons unless, within three (3) business days after the identity of the person has been provided to the Producing Party, the Producing Party objects to the disclosure of Confidential Information or Highly Confidential Information to the particular person. If objection to disclosure is made within the three (3) business days, the objecting Producing Party shall, no later than three (3) business days after its objection, petition the Court for an order prohibiting the disclosure at issue. The objecting Producing Party shall have the burden of persuasion that disclosure should not be made. If an objection is made, no Confidential Information or Highly Confidential Information shall be made available to the particular person until after the Court rules that disclosure can be made, so long as the objection is followed by a timely petition.

b)   Before any Qualified Person defined in paragraphs 12(d) or 13(c) receives any Confidential Information and/or Highly Confidential Information, the person shall be furnished with a copy of this Protective Order and shall acknowledge, by executing the acknowledgment form attached hereto as Exhibit B, that he or she has read this Protective Order, understands it, and agrees to be bound by it, and also expressly consents to the jurisdiction of this

6

Court in connection with any proceeding or hearing relating to the enforcement of this Protective Order.

        c)      The attorneys of record for a Receiving Party shall retain a copy of each such written list (Exhibit A) and acknowledgment form (Exhibit B), and shall serve opposing counsel with a copy of such with respect to independent experts as described in paragraph 13(c).

        15.      Confidential Information and Highly Confidential Information, and the substance or content thereof, including any notes, memoranda, or other similar documents relating thereto, shall be used by a Receiving Party and its authorized representatives or designees under this Protective Order solely for the purpose of this Action and any appeals therefrom. No person or entity shall be granted Access to Confidential Information or Highly Confidential Information, including the Parties to this Action, other than as permitted by paragraphs 12 and 13 of this Protective Order. Confidential Information and Highly Confidential Information shall be maintained by the Receiving Party under the overall supervision of its attorney of record.

      In the event any person subject to the terms of the Protective Order is served with a subpoena or request for production of Confidential Information or Highly Confidential Information, that person (the "Subpoenaed Person") will give sufficient notice in writing (by facsimile) to the Producing Party to allow the Producing Party a reasonable opportunity to intervene to oppose or limit such production. Within five (5) business days (the "Response Period") of transmission of the notice of subpoena or court order to the Producing Party, the Producing Party shall inform the Subpoenaed Person in writing of the Producing Party's position concerning the subpoena or court order. If the Producing Party fails to notify the Subpoenaed Person during the Response Period, the Producing Party will be deemed to have waived any objections to the production of documents or information pursuant to the subpoena or court order.

Case: 12-1581   Document: 34   Page: 80   Filed: 10/09/2012

The Subpoenaed Person will not produce any documents or information pursuant to the subpoena during the Response Period, or while there is a pending motion for a protective order to stop the production of the requested documents or information, unless the Subpoenaed Person is otherwise ordered to do so by the court.

16.     During the course of preparing for a deposition or testimony, a deponent/witness of a Producing Party may be shown Confidential Information or Highly Confidential Information from a Producing Party's Discovery Material. When Confidential Information or Highly Confidential Information is discussed, quoted, or referred to in any deposition, the Party responsible for such disclosure shall ensure that only persons permitted by paragraph 12 or 13, as well as those deponents/witnesses described above, of this Protective Order to have Access to such Discovery Material are present. The use of any such Confidential Information or Highly Confidential Information for the purpose of any hearing or trial that is open to the public is not addressed at this time, but will be the subject of future agreements or orders as the need may arise.

17.     Any deposition transcript containing Confidential Information or Highly Confidential Information shall be marked on the cover as "CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER," as appropriate, and shall indicate as appropriate within the transcript what information has been so designated. A Party may designate any portion or all (if appropriate) of the transcript as containing Confidential Information or Highly Confidential Information by so advising within ten (10) calendar days, the deposition reporter, who shall then accordingly indicate in the deposition transcript what portion(s) of the testimony (or exhibits thereto) were so designated, or by so advising all other parties in writing, within ten (10)

8

Case 12-1581    Document 34    Page: 81    Filed: 10/09/2012

calendar days after receipt of the transcript. Until ten (10) business days have passed after the receipt of any transcript, that entire transcript shall be deemed to be and contain Highly Confidential Information. In the event of disagreement with the confidential status of a deposition transcript, it shall continue to be treated as Confidential Information or Highly Confidential Information, whichever protection is being sought, until this Court rules otherwise.

18.     The parties submit and the Court finds that there will be documents filed in this case that include confidential, proprietary and commercially sensitive information that can only be protected by sealing the documents and those portions of the memoranda that discuss the documents. The Court finds that this information is of a private business nature and is not of great public interest.

In the event that any Confidential Information or Highly Confidential Information is included with, or the contents thereof are in any way disclosed in any pleading, motion, deposition, transcript or other paper filed with the Clerk of this Court, such information shall be filed with the Clerk of the Court, without need of a motion, in sealed envelopes or containers marked with the caption of the case, a general description of the contents of the envelope or container and a legend substantially in the following form:

> UNDER SEAL — SUBJECT TO PROTECTIVE ORDER — CONTAINS CONFIDENTIAL OR HIGHLY CONFIDENTIAL MATERIAL — TO BE OPENED ONLY BY OR AS DIRECTED BY THE COURT.

Notwithstanding the foregoing, however, nothing in this agreement shall effect in any way any party's rights to introduce Confidential Information or Highly Confidential Information during trial or at any hearing in the above-captioned matter.

19.     Any person in possession of or with Access to Confidential Information or Highly Confidential Information shall exercise reasonably appropriate care with regard to the storage,

custody, or use of such Confidential Information or Highly Confidential Information in order to ensure that the confidential nature of that Discovery Material is maintained.

20.   Entering into, agreeing to, and/or producing or receiving Confidential Information or Highly Confidential Information or otherwise complying with the terms of this Protective Order shall not:

a)   Operate as an admission by any Party that any Discovery Material designated as Confidential Information or Highly Confidential Information contains or reflects trade secrets or any other type of confidential or proprietary information entitled to protection under applicable law;

b)   Prejudice in any way the rights of any Party to object to the production of documents it considers not subject to discovery, or operate as an admission by any Party that the restrictions and procedures set forth herein constitute adequate protection for any particular information deemed by any Party to be Confidential Information or Highly Confidential Information;

c)   Prejudice in any way the rights of any Party to object to the authenticity or admissibility into evidence of any document, testimony, or the Discovery Material subject to this Protective Order;

d)   Prejudice in any way the rights of any Party to seek a determination by the Court whether any Discovery Material, including that designated as Confidential Information or Highly Confidential Information, should be subject to the terms of this Protective Order;

e)   Prejudice in any way the rights of any Party to petition the Court for a further protective order relating to any purportedly Confidential Information or Highly Confidential Information;

f)     Prejudice in any way the rights of any Party to petition the Court for permission to disclose or use particular Confidential Information or Highly Confidential Information more broadly than would otherwise be permitted by the terms of this Protective Order;

g)     Prevent any Party from agreeing to alter or waive the provisions or protections provided for herein with respect to any particular Discovery Material designated as Confidential Information or Highly Confidential Information by that Party;

h)     prejudice in any way the right of any Party making that production or disclosure to maintain the trade secrets status of confidentiality of that information in other contexts.

21.   Challenge of Confidential or Highly Confidential designations:

a)     Neither the signing of this Protective Order nor the failure of a Party at the time it receives Discovery Material designated as Confidential or Highly Confidential to challenge or to object to the Confidential or Highly Confidential designations shall be deemed a waiver of its right to challenge or object to the Confidential or Highly Confidential designations at any later time.

b)     Any Party may at any time challenge the designation of any Discovery Material as Confidential or Highly Confidential and may request permission to disclose Discovery Material with a Confidential or Highly Confidential designation, other than as permitted pursuant to this Protective Order, by serving a written request via facsimile upon the attorney of record for the Producing Party at least seven (7) calendar days before the date of the proposed disclosure/use and by providing telephonic notice of such request to the attorney of record on the same date as the facsimile is transmitted. Such request shall specifically identify by

unique identifier of the Confidential Information or Highly Confidential Information sought to be disclosed and the name, title, and function of the person to whom disclosure is desired to be made or the use to be made of such Confidential Information or Highly Confidential Information. The Designating Party shall thereafter respond to the request in writing within seven (7) calendar days after receipt of same. Absent good cause shown, a failure to respond within such time shall constitute consent to the request. If, where consent has been withheld, the parties are subsequently unable to agree on the terms and conditions of disclosure, the matter may be submitted to the Court for resolution by the Party or Third Party seeking disclosure. Disclosure shall be postponed until a ruling has been obtained from the Court.

22.     Notwithstanding any default provisions of this Protective Order providing for the treatment of Discovery Material as Confidential Information or Highly Confidential Information, in the event of disagreement, the designating Party shall have the burden of proving that the Discovery Material at issue is entitled to the protection of this Protective Order.

23.     All provisions of this Protective Order restricting the use of Discovery Material shall continue to be binding on the Parties and all persons who have received Discovery Material under this Protective Order after the conclusion of this Action, including all appeals, until further Order of the Court, unless otherwise agreed upon in writing.

a)     Any and all originals and copies of Discovery Material designated as Confidential or Highly Confidential, shall, at the request of the Producing Party, be returned within sixty (60) days after a final judgment in this Action or settlement of this Action, or at the option of the Producing Party, destroyed in that time frame, except that the attorneys of record for each Party or Third Party may maintain in its files one copy of each pleading filed with the Court, each propounding discovery request along with its corresponding response, each

12

Case: 12-1581   Document: 34   Page: 85   Filed: 10/09/2012

deposition together with the exhibits marked at the deposition, and documents constituting work product that were internally generated and that were based upon or that include Confidential Information or Highly Confidential Information.

b)      In the event that an attorney of record maintains such documents or information, it shall not disclose material containing any type of Confidential Information or Highly Confidential Information to another person or entity absent subpoena or court order. Upon receipt of any subpoena or court order for such information, the attorney receiving the subpoena (the "Receiving Attorney") shall immediately notify in writing (by facsimile transmission) the attorneys of record for the Producing Party of the subpoena or court order so that the Producing Party may act to protect its interests. Within five (5) business days (the "Response Period") of transmission of the notice of subpoena or court order to the Producing Party, the Producing Party shall inform the Receiving Attorney in writing of the Producing Party's position concerning the subpoena or court order. If the Producing Party fails to notify the Receiving Attorney during the Response Period, the Producing Party will be deemed to have waived any objections to the production of documents or information pursuant to the subpoena or court order. The Receiving Attorney will not produce any documents or information pursuant to the subpoena during the Response Period, or while there is a pending motion for a protective order to stop the production of the requested documents or information, unless the Receiving Attorney is otherwise ordered to do so by the court.

c)      In the event that Discovery Material is returned to the Producing Party or destroyed, the party returning or destroying that Discovery Material or its attorneys of record shall certify in writing that all such Discovery Material has been returned or destroyed.

24.    The inadvertent production of privileged information or work-product material shall be governed by Fed. R. Evid. 502.

25.    The Parties agree that materials that are subject to any claim of privilege or protection, including but not limited to the attorney-client privilege or the protection afforded to work-product materials, but which were generated after the date of the filing of the Complaint, do not need to be included in any privilege log produced in this Action.

26.    The inadvertent or unintentional production of Discovery Material without an appropriate designation of confidentiality shall not be deemed a waiver or impairment of any claim of confidentiality, provided the Producing Party shall immediately notify the Receiving Party in writing when the inadvertent or unintentional production is discovered. Upon receiving written notice from the Producing Party that Confidential Information or Highly Confidential Information has been inadvertently or unintentionally produced, all such information shall be treated as if it were appropriately designated. Upon receipt of appropriately designated substitute materials, the undesignated materials, and all copies thereof, shall be returned to the Producing Party or, at the option of the Producing Party, destroyed with written confirmation of the destruction. In the event the Receiving Party disputes the designation of the Discovery Material as Confidential Information or Highly Confidential Information by the Producing Party and the Parties are unable to resolve the dispute, the Receiving Party may submit the matter to the Court for resolution.

27.    Nothing in this Protective Order shall bar or otherwise restrict any attorney for the Parties from rendering advice to his or her client with respect to this litigation.  In the course of doing so, said attorney may generally refer to or rely upon his or her examination of "Confidential Information" of "Highly Confidential Information," but shall not disclose the

14

specific contents of such information to persons not authorized to receive such information pursuant to this Order. Such Confidential Information and Highly Confidential Information shall only be referred to or relied upon to extent reasonably necessary to provide advice necessary for the purposes of the litigation.

28.     Until such time as this Protective Order has been entered by the Court, the Parties agree that upon execution by the Parties, it will be treated as though it had been "So Ordered."

29.     The Court retains jurisdiction subsequent to settlement or entry of judgment to enforce the terms of this Protective Order.

SO ORDERED:

DATED THIS  _19th_ day of _July_, 2011

/s/
_____
James R. Spencer
Chief United States District Judge

We ask for this:

_____
Timothy C. Bass, VA Bar No: # 40122
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
Telephone: (202) 533-2323
Facsimile: (202) 261-0123
*basst@gtlaw.com*

Richard D. Harris*
Kevin J. O'Shea*
Matthew J. Levinstein*
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
*harrisr@gtlaw.com*
*osheak@gtlaw.com*
*levinsteinm@gtlaw.com*

_____
John Lee Newby, II*
Robert Michael Tyler
William Norbert Federspiel
McGuire Woods LLP
901 E. Cary Street
Richmond, VA 23219
Telephone: (804) 775-1000
Facsimile: (804) 775-1061
*jnewby@mcguirewoods.com*
*rtyler@mcguirewoods.com*
*wfederspiel@mcguirewoods.com*

Frederick A. Tecce*
MCSHEA/TECCE, PC
The Bell Atlantic Tower -
28th Floor
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 599-0800
Facsimile: (215) 599-0888

15

Kimberly A. Warshawsky*
GREENBERG TRAURIG, LLP
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
Telephone: (602) 445-8000
Facsimile: (602) 445-8100
*warshawskyk@gtlaw.com*

*Attorneys for Defendant Sunbeam Products, Inc.*
*d/b/a Jarden Consumer Solutions*

*ftecce@mcshea-tecce.com*

Stephen E. Murray*
Bijal Shah-Creamer*
PANITCH SCHWARZE BELISARIO &
NADEL LLP
One Commerce Square
2005 Market Street, Suite 2200
Philadelphia, PA 19103
Telephone: (215) 965-1330
Facsimile: (215) 965-1331
*smurray@panitchlaw.com*
*bshah@panitchlaw.com*

*Attorneys for Plaintiff Hamilton Beach*
*Brands, Inc.*

* *admitted pro hac vice*

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| HAMILTON BEACH BRANDS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 3:11-cv-00345-JRS |
| | ) |
| SUNBEAM PRODUCTS, INC. | ) |
| d/b/a JARDEN CONSUMER | ) |
| SOLUTIONS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

LIST OF QUALIFIED PERSONS, ¶¶ 12(d)

| NAME | BUSINESS ADDRESS | OCCUPATION/TITLE | GOVERNING PARAGRAPH | DATE IDENTIFIED |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| HAMILTON BEACH BRANDS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 3:11-cv-00345-JRS |
| | ) |
| SUNBEAM PRODUCTS, INC. | ) |
| d/b/a JARDEN CONSUMER | ) |
| SOLUTIONS, | ) |
| | ) |
| Defendant. | ) |

**CONFIDENTIALITY UNDERTAKING**

I acknowledge that Discovery Material, Confidential Information and/or Highly Confidential Information have been or will be provided to me pursuant to the terms and restrictions of the Agreed Protective Order entered by the United States District Court for the Eastern District of Virginia (hereinafter "District Court") in the above-captioned civil action. I further acknowledge that I have read the Agreed Protective Order, understand the terms of the Agreed Protective Order, agree to be fully bound by the Agreed Protective Order, and hereby submit to the jurisdiction of the District Court for purposes of enforcement of the Agreed Protective Order. I understand that violation of the Agreed Protective Order may be punishable by contempt of Court.

Date:_____

_____
Name [please print]

_____
Signature

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

HAMILTON BEACH BRANDS, INC.,

Plaintiff,

v.                                                    Action No. 3:11-CV-345

SUNBEAM PRODUCTS, INC.,
d/b/a JARDEN CONSUMER SOLUTIONS,

Defendant.

## THE COURT'S CLAIM CONSTRUCTION ORDER

THIS MATTER is before the Court pursuant to *Markman v. Westview Instruments,*
*Inc.*, 52 F.3d 967 (Fed. Cir. 1995), to construe certain terms contained in U.S. Patent No.
7,947,928 ("'928 Patent"). The Court hereby construes the following terms of the claims of
the '928 Patent:

1. The claim language "lid having a gasket around an outer edge thereof" ('928
   Patent claims 1, 3, 6) is construed as follows: "a gasket generally disposed along
   the circumference of a lid."

2. The claim language "clip" ('928 Patent all claims) is construed as follows: "a
   conventional over-the-center latch with a hook and a catch."

3. The claim language "clip mounted between the lid and the side wall of the
   housing" ('928 Patent claims 1, 3, 6) is construed as follows: "a clip that extends
   between the side wall of the housing and the lid."

1

4.  The claim language "container rim" ('928 Patent claims 1–4, 6–7) is construed as
    follows: "the upper portion of the container that includes the ledge adjacent to
    the container opening."

5.  The claim language "clip being selectively engageable with the lid and side wall
    of the housing to selectively retain the lid in sealing engagement with the
    container rim" ('928 Patent claims 1, 3, 6) is construed as follows: "the clip can
    operate between the lid and the side wall of the housing to keep the lid sealed
    against the container rim."

6.  The claim language "hook" ('928 Patent claims 1, 3–7) is construed as follows:
    "the portion of the clip that simultaneously extends or lies, at least partially, in
    both the vertical and horizontal planes when in the closed or locked position."

Let the Clerk send a copy of this Order to all counsel of record.

It is SO ORDERED.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this __20th___ day of December 2011

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

HAMILTON BEACH BRANDS, INC.,

Plaintiff,

v.

SUNBEAM PRODUCTS, INC.,
d/b/a JARDEN CONSUMER SOLUTIONS,

Defendant.

Action No. 3:11-CV-345

**FILED UNDER SEAL**

**MEMORANDUM OPINION**

THIS MATTER is before the Court on cross motions for summary judgment. For the reasons that follow, the Court will GRANT Sunbeam Products, Inc.'s Motion (Doc. No. 121), and DENY Hamilton Beach Brands, Inc.'s Motion (Doc. No. 115).

**I.    BACKGROUND**

This patent infringement action concerns slow cookers. Plaintiff Hamilton Beach Brands, Inc. ("Hamilton Beach") claims that Sunbeam Products, Inc.'s ("Sunbeam") Cook & Carry slow cooker device infringes claims 1 and 3–7 of U.S. Patent No. 7,947,928 ("'928 patent").

The '928 patent, filed June 4, 2010 and issued May 24, 2011, is a continuation of U.S. Patent Application No. 12/255,188 ("'188 application"), filed October 21, 2008 and currently pending before the United States Patent and Trademark Office ("PTO"). The '188 application, in turn, is a continuation of U.S. Patent Application No. 11/365,222, filed March 1, 2006 and issued February 3, 2009 as U.S. Patent No. 7,485,831 ("'831 patent"). Following

1

the chain of continuation applications, the '928 patent claims priority back to the filing date of the '831 patent.

Hamilton Beach and Sunbeam compete directly in the small kitchen appliance industry, particularly with respect to slow cookers. The commercial embodiment of the '928 patent, launched in 2005, is Hamilton Beach's Stay or Go slow cooker. The Stay or Go features a clip that seals the lid of the slow cooker to the container, thereby preventing undesirable movement of the lid and spillage of foodstuffs from the container. Sunbeam, which manufactures and sells slow cookers under the Crock-Pot trademark, began selling a "Crock-Pot Cook & Carry" line of slow cookers after the '831 patent issued in 2010. As the names "Stay or Go" and "Cook & Carry" suggest, both slow cookers are designed with portability in mind. Hamilton Beach claims that Sunbeam copied the Stay or Go, and that it drafted the claims of the '928 patent, prosecuted under the PTO's "Accelerated Examination" procedure, in an effort to cover the configuration of Sunbeam's Cook & Carry. Hamilton Beach filed its Complaint for patent infringement in this Court the very same day the '928 patent issued—May 24, 2011—and moved for a preliminary injunction only two days later.

After briefing and argument from the parties, the Court denied Hamilton Beach's motion for a preliminary injunction on August 15, 2011. (Doc. No. 58.) On December 20, 2011, again after briefing and argument from the parties, the Court issued its Claim Construction Order pursuant to *Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995). Two of the Court's claim constructions—that of the claim terms "hook" and "container rim" (both present in all of the asserted claims)—are critical here. The Court construed "hook" as "the portion of the clip that simultaneously extends or lies, at least

partially, in both the vertical and horizontal planes when in the closed or locked position."
(Claim Construction Order, Doc. No. 79, at 2.) The Court construed "container rim" as "the
upper portion of the container that includes the ledge adjacent to the container opening."
(*Id.*)

Those constructions are critical to the two noninfringement arguments that
Sunbeam now advances on summary judgment: that its accused Cook & Carry device does
not meet (1) the "hook" limitation present in all of the asserted claims; and (2) the "hook . . .
shaped to extend from the lever and around the container rim" limitation present in claims
3, 4, and 7.

The parties' summary judgment motions present a number of issues. The first
category of issues relates to infringement, and specifically the question of whether
Sunbeam's Cook & Carry infringes the two limitations above either literally or under the
doctrine of equivalents. The remaining issues relate to invalidity. Sunbeam asserts that the
'928 patent is invalid because Hamilton Beach: (1) cannot claim priority to the '831 patent
as it introduced "new matter" into the '928 specification, which would render the '928
patent's claims anticipated under 35 U.S.C. § 102(a) and (b); (2) offered for sale and (3)
publicly used the Stay or Go slow cooker more than one year prior to the '831 application
date, which would render the '928 patent claims invalid even if the '928 patent can claim
priority to the '831 application. Finally, Sunbeam asserts that the '928 patent is invalid as
obvious.

The Court takes those issues up below in turn.

## II.    LEGAL STANDARD

A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing the nonexistence of a triable issue of fact by "showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Therefore, if the nonmoving party's evidence is only colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50.

In considering whether summary judgment is proper, the Court must look to whether a rational trier of fact, viewing the record in its totality, could find for the nonmoving party. *See Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992) (citing *Anderson*, 477 U.S. at 248–49). All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing [the] motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)) (internal quotation marks omitted).

When considering cross motions for summary judgment, the Court must apply the same standard outlined above, and cannot resolve genuine issues of material fact. *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999). The Court should "consider and rule upon each party's motion separately and

4

determine whether summary judgment is appropriate as to each under the Rule 56 standard." *Id.*

### III. ANALYSIS

#### A. Infringement

To prove infringement, a patent holder must demonstrate that "each and every limitation set forth in a claim appear[s] in an accused product." *See V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1312 (Fed. Cir. 2005). "Summary judgment on the issue of infringement is proper 'when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents.'" *Fellowes, Inc. v. Michilin Prosperity Co.*, 491 F. Supp. 2d 571, 585 (E.D. Va. 2007) (quoting *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005)).

#### 1. Literal infringement

#### a. The "hook" limitation (all asserted claims)

The Court construed the term "hook" present in all of the asserted claims as "the portion of the clip that simultaneously extends or lies, at least partially, in both the vertical and horizontal planes when in the closed or locked position." (Claim Construction Order, Doc. No. 79, at 2.)

Relying on the opinion of its expert, Dr. Lee Swanger, Sunbeam argues it cannot literally meet this limitation because the Cook & Carry's latching mechanism, when in the locked position, does not extend in *both* the vertical and horizontal planes. Rather, Sunbeam argues that while one portion of its latching mechanism lies in "close to [a] vertical" plane, "the second portion lies at a 45-degree angle—i.e., not even partially in the

5

horizontal plane." (Def.'s Mem. Supp. Mot. Summ. J. 11 (emphasis omitted).) To illustrate this idea, Sunbeam supplies a figure that superimposes lines intersecting at a 90 degree angle over a photograph of the Cook & Carry, where the horizontal line intersects the vertical line at the bend in the wire portion of its latching mechanism:



(*Id.* at 11.)

Hamilton Beach first responds that Dr. Swanger's opinion with respect to the hook limitation is a "sham" proffered solely for the purpose of surviving summary judgment. Citing Swanger's testimony from the preliminary injunction hearing, Hamilton Beach asserts that Swanger admitted that the Cook & Carry includes the "hook" claimed in the '928 patent.

Hamilton Beach next addresses the substance of the "hook" limitation. Hamilton Beach agrees that when engaged, the Cook & Carry's latching mechanism lies in a vertical plane below the bend in the wire. But Hamilton Beach contends, "Above the bend, the wire form proceeds at an angle with respect to the lower portion so as to at least partially lie in both the horizontal and vertical planes." (Pl.'s Mem. Supp. Mot. Summ. J. 17.) Thus,

6

Hamilton Beach argues that the shape of the wire form in the Cook & Carry is similar, before and after the bend, to the wire form shown in figure 2 of the '928 Patent:



'928 Patent fig.2.

Swanger's analysis, Hamilton Beach argues, amounts to nothing more than strategically placing a horizontal superimposed line in an effort to avoid literal infringement. In Hamilton Beach's view, Swanger carefully positioned his horizontal line so that no part of the Cook & Carry wire form lies within that horizontal line, and hence within the horizontal plane, when a horizontal line just as easily could have been drawn in a higher location that would demonstrate infringement under Swanger's "superimposed line" methodology. To illustrate this idea, Hamilton Beach superimposes its own dotted line—parallel to and above Sunbeam's—so the wire form of Sunbeam's Cook & Carry intersects its horizontal line:

7



(Pl.'s Mem. Supp. Mot. Summ. J. 19.)

As Hamilton Beach would have it, Swanger's analysis is incorrect in light of the Court's claim construction of "hook" and the intrinsic record: applying Swanger's superimposed line methodology to figure 2 of the '928 Patent, Hamilton Beach argues that the top portion of the wire form disclosed in the '928 patent, in the closed or locked position (23), would be positioned above a superimposed horizontal line placed in the same effective position as Swanger's superimposed horizontal line, and thus not within the "horizontal plane":



Fig. 2 of the '928 Patent

8

(*Id.* at 20.) Hamilton Beach argues this analysis is improper for two reasons. First, Hamilton Beach argues that it "essentially creates an addendum to the Court's claim construction of 'hook' by requiring the placement of horizontal and vertical lines in a specific location relative to the hook." (*Id.*) Second, Hamilton Beach argues Swanger's methodology would read the preferred embodiment shown in figure 2 out of the claims, which is "rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). For all of these reasons, Hamilton Beach argues it is entitled to a finding of literal infringement on the "hook" limitation.

The Court finds that Sunbeam has the better part of this argument. As an initial matter, Hamilton Beach's insistence that Swanger admitted under oath that the Cook & Carry contains the "hook" claimed in the '928 patent simply is not true. Swanger never testified to that effect; to the contrary, his statements merely reflect the fact that the Cook & Carry has *a* hook. In no way did Swanger state that the Cook & Carry contains *the* hook claimed in the '928 patent. To paint Swanger's words otherwise distorts his testimony.

More important, Hamilton Beach fails to explain why Swanger's opinion regarding the hook limitation is improper or why it fails to properly take into account the Court's construction of the term "hook." In the Court's view, no reasonable juror could find that the wire form of the clip on Sunbeam's Cook & Carry slow cooker "simultaneously extends or lies, at least partially, in both the vertical and horizontal planes when in the closed or locked position."

The following statement from Hamilton Beach's expert, Dr. Edward Caulfield, is representative of Hamilton Beach's argument with respect to literal infringement of the "hook" limitation: "As shown in Figure 13, all portions (both before and after the bend) of

9

the hoo c lie at least partially in both the vertical and horizontal planes in the closed

position." (Caulfiel l Decl. Ex. A ¶ 44.) This statement does little more than parrot the claim

language, but wors e for Hamilton Beach, Caulfield's own figure 3 seems, if anything, to

support Sunbeam's position.



(*Id.*) Th e dotted lin e on Dr. Caulfield's own Figure 13 fails to hig hlight that all portions of

the wire form on Sunbeam's Cook & Carry "lie at least partially i n both the vertical and

horizon tal planes i n the closed position." Rather, it seems to hig hlight that the wire form as

a whole lies in a ve tical position.

'he parties' superimposed lines, however, ar unnecessary to the ultimate analysis.

Looking carefully a t the wire form on the Cook & Car ry in the cl osed position, it is clear that

the bottom portion of the wire form lies in a vertical plane. The top portion of the wire

form, h wever, does not lie in a horizontal plane; it lie s in a plane that is neither vertical

nor horizontal. Ind eed, to the naked eye the top portion of the wire form seems to lie in a

plane e tending at an angle of approximately 45 deg rees. Hamil on Beach argues this

10

position has no evidentiary support, and further, that it actually demonstrates literal infringement, "because the second portion of the wire form is extending partially in *both planes*, since both the horizontal and vertical components of the wire form change from one point to the next." (Pl.'s Reply 6.) But further evidence is unnecessary to demonstrate what a reasonable juror can plainly see, and adopting Hamilton Beach's position would mean that any wire form having a bend, however slight, would simultaneously extend in both vertical and horizontal planes—a position that defies a common-sense application of the terms "vertical" and "horizontal." The Court finds that while a reasonable juror should find that the bottom portion of the Cook & Carry wire form extends in a vertical plane when in the closed or locked position, no reasonable juror could find that the top portion simultaneously extends in a "horizontal" plane when in the closed or locked position. Accordingly, the Court grants Sunbeam summary judgment of noninfringement with respect to literal infringement of the "hook" limitation present in all of the asserted claims.

### b. The "hook . . . shaped to extend from the lever and around the container rim" limitation (claims 3, 4, 7)

Present in claims 3, 4, and 7 of the '928 patent is the limitation "hook . . . shaped to extend from the lever and around the container rim."[1] The Court construed the term "container rim" present in those claims as "the upper portion of the container that includes the ledge adjacent to the container opening." (Claim Construction Order, Doc. No. 79, at 2.)

---

[1] With respect to claims 3 and 4 (claim 4 depending on claim 3), the ellipsis denotes omission of the single word "being," i.e., "hook *being* shaped to extend from the lever and around the container rim." '928 Patent col.9 ll.14–15 (emphasis added). With respect to claim 7, the ellipsis denotes omission of a larger phrase (again, set off in italics): "hook *of each over-the-center clip is* shaped to extend from the lever and around the container rim." '928 Patent col.10 ll.35–37 (emphasis added).

11

Sunbeam argues that the wire element[2] of its Cook & Carry simply does not extend "around the container rim," but instead stops well short of the ledge adjacent to the container opening. To illustrate this argument, Sunbeam supplies the following image of its Cook & Carry slow cooker in its brief:



(Def.'s Mem. Supp. Mot. Summ. J. 12.)

Hamilton Beach responds that Sunbeam's argument is based on an interpretation of the term "around" that is unsupported by any authority or by the intrinsic record. According to Hamilton Beach, Dr. Swanger contends that the plain and ordinary meaning of "around" supports the position that the wire portion of the latching mechanism of Sunbeam's Cook & Carry must traverse the entire width of the container rim in order to extend "around" the container rim. Hamilton Beach argues, however, that Swanger is unable to recite the basis for this "plain and ordinary" definition of "around," and fails to

---

[2] Sunbeam uses this terminology in its argument instead of "hook" because it contends that its Cook & Carry product does not possess a "hook" as the Court construed the term.

12

cite to any evidence in the intrinsic record, and particularly the specification, that requires

that "around" means "all the way around." (Pl.'s Mem. Supp. Mot. Summ. J. 21.)

      Hamilton Beach states that if Sunbeam wanted an interpretation of the word

"around" to require that it means "completely around" as Swanger implicitly contends,

Sunbeam should have raised that issue during claim construction. In any event, Hamilton

Beach claims that Swanger's position cannot be gleaned from the drawings in the '928

specification, because one cannot discern that the hook, when in the engaged position,

traverses the entire width of the container rim. In sum, Hamilton Beach argues that

Sunbeam, through Swanger, is simply attempting to import a fictitious limitation into

claims 3, 4, and 7.

      Hamilton Beach argues that Dr. Caulfield, "[i]n contrast . . . has affirmatively shown

that the hook of the Cook & Carry slow cooker is literally shaped to extend from the lever,

mounted to the lid, and around the container rim to the catch, which is mounted on the side

wall of the slow cooker housing." (Pl.'s Mem. Supp. Mot. Summ. J. 22.) Caulfield explains

that such a shape is necessary on Sunbeam's Cook & Carry cooker

> because the container rim lies directly between the catch on the side wall and
> the connection point of the hook to the lever. A "straight" hook could not be
> used because the container rim would interfere with and prevent the hook
> from engaging the catch. It is therefore necessary that the hook be shaped to
> bypass or avoid the container rim, which is accomplished by shaping the
> hook to extend around the container rim.

(*Id.*) Hamilton Beach therefore submits that no reasonable juror could find that the Cook &

Carry does not literally infringe claims 3, 4, and 7.

      The Court finds that Sunbeam's argument that the wire element of its Cook & Carry

cannot literally infringe the "hook . . . shaped to extend from the lever and around the

container rim" limitation because its wire element stops well short of the ledge adjacent to

13

the container opening is supported by the plain and ordinary meaning of the term

"around." While Hamilton Beach complains Sunbeam is asking the Court to revisit claim

construction, in fact it is Hamilton Beach that is asking the Court to do so: at the claim

construction stage of this case, Hamilton Beach never asked the Court to construe the term

"hook" in isolation, but instead asked that the Court construe the entire phrase "hook being

shaped to extend from the lever and around the container rim" as "the hook simultaneously

lies, at least partially, in a first plane defined by the lid and a second plane defined by the

side wall of the housing." (Pl.'s Cl. Constr. St., Doc. No. 66, at 1–2.) Such a construction

would have had the practical effect of discarding the claim language "around the container

rim." Further, Sunbeam is right to point out that Caulfield's ultimate opinion on this issue,

stripped to its core, is that the wire element of the Cook & Carry latching mechanism

infringes claims 3, 4, and 7 because of its *shape*—that it is not a "straight hook." This

argument ignores the simple, plausible, and inescapable contention that the wire element

of the Cook & Carry cannot extend "around" the container rim as it does not even come

close to the inner edge of the container rim. For all of these reasons, the Court finds that no

reasonable juror could find that Sunbeam's Cook & Carry slow cooker meets the "hook . . .

shaped to extend from the lever and around the container rim" limitation present in claims

3, 4, and 7. Accordingly, the Court grants Sunbeam summary judgment of noninfringement

with respect to literal infringement of the "hook . . . shaped to extend from the lever and

around the container rim" limitation present in claims 3, 4, and 7.

## 2.    Infringement under the doctrine of equivalents

A patent holder may show infringement under the doctrine of equivalents: (1) if the

differences between an element of the accused device and the claim limitation are

14

insubstantial; or (2) using the "function-way-result" test. *See Voda v. Cordis Corp.*, 536 F.3d

1311, 1326 (Fed. Cir. 2008) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S.

17, 40 (1997)). Infringement under the doctrine of equivalents, as with literal infringement,

is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). However,

summary judgment may be granted on a claim of infringement under the doctrine of

equivalents "where the evidence is such that no reasonable jury could determine two

elements to be equivalent." *Id.* (quoting *Warner-Jenkinson*, 520 U.S. at 39 n.8).

Hamilton Beach argues that even if a reasonable fact finder could find no literal

infringement with respect to the "hook" limitation present in all of the claims, the Cook &

Carry nevertheless has an element that is equivalent to the "hook" claimed in the '928

patent. "Specifically, the function of the hook in the '928 patent is to join the lever portion

of the clip mounted in a first orientation to the catch portion of the clip, which is mounted

in a second orientation." (Pl.'s Mem. Supp. Mot. Summ. J. 17–18.) The '928 Patent

accomplishes this function by putting a bend in a portion of the clip, which allows the clip

to lie in multiple planes. The result is that the lid can be joined in sealing engagement with

the container. "The wire form in the Cook & Carry slow cooker performs in substantially

the same way, since the lever and catch are mounted in differing orientations, and the wire

form (with a bend) serves to simultaneously join these two clip portions, thereby sealing

the lid." (*Id.* at 18.)

Hamilton Beach further argues that even if Sunbeam's Cook & Carry does not

literally infringe the "hook . . . shaped to extend from the lever and around the container

rim" limitation, the Cook & Carry nevertheless infringes this limitation under the doctrine

of equivalents because it has a latching mechanism that is equivalent to a hook "shaped to

15

extend from the lever and around the container rim." Dr. Caulfield opines that the function

of the hook in the '928 Patent is to "'extend[ ] from the lever to the catch to couple the lid

with the housing,' that this function is accomplished by 'providing a hook with a shape that

extends in multiple planes,' and that the result is 'a hook with the ability to engage with the

catch.'" (*Id.* at 23 (quoting Caulfield Decl. Ex. A. ¶ 59).) Caulfield clarifies that, though the

hook of the Cook & Carry is not long enough to span the entire container rim disclosed in

the '928 Patent, this is an insubstantial difference given the hook's intended use. In

Caulfield's opinion, then, the Cook & Carry meets all of the elements of the function-way-

result test.

Sunbeam responds that prosecution history estoppel forecloses Hamilton Beach's

claim that Sunbeam's Cook & Carry infringes under the doctrine of equivalents. With

respect to the "hook" limitation, Sunbeam argues that Hamilton Beach specifically limited

its claims to a particular type of over-the-center clip—one with a hook that "must . . .

simultaneously extend or lie, at least partially, in both planes (i.e., vertical and horizontal)

in the closed or locked position" (Def.'s Mem. Supp. Mot. Summ. J. Ex. 49, at 15–16)—in

response to PTO obviousness rejections. Sunbeam further argues that Hamilton Beach

narrowed the equivalents it can rely on with respect to the "around the container rim"

claim language, as it specifically distinguished the '928 patent's hook from prior art

references that did not have hooks that went around their "rim." Hamilton Beach stated, for

example, in a Reply to a PTO Office Action, "If the hook of the over-the-center clip of

amended claim 3 is *not* structurally configured to extend *around* the container rim and

simultaneously span or extend in these two planes in the closed or locked position, the lid

will *not* be retained in sealing engagement on the container rim." (*Id.* at 16.) Sunbeam

16

points out that Hamilton Beach itself emphasized the language in the preceding quote, and argues Hamilton Beach "clearly and unmistakably surrendered claim scope covering hooks that do not simultaneously extend or lie in both the horizontal and vertical planes." (Def.'s Mem. Supp. Mot. Summ. J. 13.) In Sunbeam's view, the Court cannot find Sunbeam infringes under the doctrine of equivalents because such a finding would allow Hamilton Beach to recapture through the doctrine of equivalents claim scope it unmistakably surrendered in order to obtain a patent.

With respect to the "hook" limitation, Sunbeam also focuses on the idea that the Cook & Carry's latching mechanism performs the function of sealing the lid against the vessel in a substantially different way because the '928 patent's claimed "hook" results in a significantly greater horizontal force component, and thus a greater total force, than the Sunbeam design.

The Court finds that further factual development is necessary with respect to these issues, and accordingly, that summary judgment is improper.

### B. Invalidity

#### 1. New Matter

The patent system's prohibition on new matter, enumerated in the statement, "No amendment shall introduce new matter into the disclosure of the invention," 35 U.S.C. § 132(a), is enforced through the written description requirement of 35 U.S.C. § 112, ¶ 1. *See, e.g.*, *Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1378–79 (Fed. Cir. 2008). Thus, the issue presented by a new matter defense is "whether the specification of the original application contained a written description of the invention sufficient to allow persons of ordinary skill in the art to recognize that the

17

inventor invented the subject matter that is claimed in the asserted claims." *Id.* at 1379
(citing *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 993 (Fed. Cir. 1999)). In
this case, the relevant original application is the '831 application, because Hamilton Beach
claims priority, *see* 35 U.S.C. § 120, to the date of that application's filing. Therefore, "the
disclosure of the earlier filed ['831] application must describe the later . . . invention
[claimed in the '928 patent] 'in sufficient detail that one skilled in the art can clearly
conclude that the inventor invented the claimed invention as of the filing date sought.'"
*Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1331 (Fed. Cir. 2008) (quoting
*Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).

Two burdens of proof are at play with respect to this new matter issue. As neither
the PTO nor the Board of Patent Appeals made a priority determination, it is Hamilton
Beach's burden to establish *priority* to the filing date of the '831 application. *See
PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304–05 (Fed. Cir. 2008). Patents,
however, are presumed valid. 35 U.S.C. § 282. It is therefore Sunbeam's burden to prove
*invalidity* by clear and convincing evidence. *PowerOasis*, 522 F.3d at 1305. Should Sunbeam
meet its burden of establishing a *prima facie* case of invalidity, Hamilton Beach "is then
obligated to come forward with evidence to the contrary." *Id.* (quoting *Ralston Purina Co. v.
Far-Mar-Co, Inc.*, 772 F.2d 1570, 1573 (Fed. Cir. 1985)) (internal quotation marks omitted).

Sunbeam's new matter argument is straightforward: Sunbeam states that Hamilton
Beach filed the '928 application as a continuation application, expressly for the purpose of
writing claims to cover Sunbeam's Cook & Carry. But Hamilton Beach had a problem:
Sunbeam's Cook & Carry had the reverse of the configuration Hamilton Beach disclosed
and claimed in its earlier patent applications.

Sunbeam argues the '831 patent disclosed a slow cooker having a latching mechanism where the hook and lever are mounted on the sidewall, and a "catch" is mounted on the lid. The '831 patent defined the term "clip" as "a generally conventional over-the-center clip having a hook 22*a* and a lever 22*b*." '831 Patent col.5 ll.17–18. This definition excluded the "catch," and was appropriate given the fact that the slow cooker disclosed in the '831 patent only had clips mounted to the housing's side wall. Indeed, according to Sunbeam, nothing in the prosecution history of the '831 patent disclosed or even suggested over-the-center clips on the *lid* of the slow cooker.

Since the '831 patent did not disclose "clips" mounted on the lid—which was Sunbeam's reverse configuration—the '928 patent specification broadened the definition of "clip" to specifically include the "catch" so as to provide written description support for the claims written to cover Sunbeam's Cook & Carry.[3] Hamilton Beach broadened the definition of "clip" using language phrased in the alternative, so as to attempt to cover not only a slow cooker with a catch mounted on the lid, but also a cooker with a catch mounted on the side wall: "The slow cooker further includes at least one clip mounted between the lid and the side wall of the housing, the at least one clip being an over-the-center clip having a hook and a catch, one of the hook and catch being mounted on one of the lid and side wall of the housing and the other of the hook and catch being mounted on the other of the lid and side wall of the housing." '928 Patent col.1 l.66–col.2 l.5.

Relying on Swanger's invalidity report, Sunbeam argues: "The definition of 'clip' in Plaintiff's earlier patent applications, which excluded the catch, would not have provided

---

[3] In support of this proposition, Sunbeam cites to a "redline" comparison showing the precise differences in the language of the "Brief Summary of the Invention" sections of the '831 and '928 patent specifications. (*See* Def.'s Mem. Supp. Mot. Summ. J. Ex. 5.)

written description support for these broader claims, in violation of 35 U.S.C. § 112, ¶ 1."

(Def.'s Mem. Supp. Mot. Summ. J. 17.) Therefore, Sunbeam contends Hamilton Beach is not

entitled to the priority date of the '831 application. Without the benefit of the priority filing

date of the '831 application, Sunbeam argues Hamilton Beach's own Stay or Go cooker,

which has been on the market since as early as 2005, as well as Sunbeam's Cook & Carry

slow cookers, which were known and used by others in the United States beginning in

2009, anticipate the asserted claims under 35 U.S.C. § 102(a) and (b).

Hamilton Beach responds that Sunbeam cannot rely on the "flawed" legal opinions

of its technical expert regarding changed definitions of the term "clip." Dr. Swanger is

unqualified to engage in such an analysis and it cannot form the basis for summary

judgment in Sunbeam's favor. Hamilton Beach's technical expert, on the other hand,

"reviewed the applications and determined that one of ordinary skill in the art would

understand from the originally-filed disclosure that the invention of the '928 patent claims

was supported by and described in the originally-filed application." (Pl.'s Mem. Opp. Def.'s

Mot. Summ. J. 14.)

Hamilton Beach contends it is not disputed that in the third and fourth quarters of

2008, after struggling to complete a feasible "knock-off" of Hamilton Beach's slow cooker,

Sunbeam "made an insignificant and unsubstantial change" in the design of its cooker, by

inverting the mounting configuration of the lever, hook, and latch components. After this

inverted product came on the market, Hamilton Beach then filed a continuation application,

as the law allows, making "no substantive changes" to the disclosure.[4] Though both of the

---

[4] For this proposition, Hamilton Beach relies on its own "redline" comparison of the '831
and '928 patents. (*See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. Ex. Z.) The "Brief Summary of the
Invention" section of the comparison, of course, reveals the changes highlighted by

patent applications described a particular embodiment in which the lever and hook are mounted to the side wall and the catch is mounted to the lid, *both* confirm that this configuration is only *preferred*, not required. Sunbeam's alternative configuration logically flows from both of the descriptions in the patents, which were not changed. "Thus, even following Dr. Swanger's flawed reasoning that the clip only includes a lever and a hook, the original disclosure explicitly supports mounting of the lever and hook on the lid of the slow cooker. This is wholly consistent with the testimony of Sunbeam's outside designer." (*Id.* at 16.) Hamilton Beach states that Sunbeam's new matter argument is "nothing more than a 'Rube Goldberg' effort to limit the patent to a single embodiment [where] the hook and lever components [are] mounted on the side wall of the slow cooker housing and the catch [is] mounted on the lid." (*Id.*) Hamilton Beach argues that as there are no "words or expressions of manifest exclusion or restriction," *Martek Biosciences Corp. v. Nutrivona, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009), in the disclosure, and by Swanger's admission, no express definition of the term "clip" in the '831 patent that affirmatively excludes the catch, there is no evidence of intent to limit the invention disclosed in the '831 patent to one particular mounting configuration.

Hamilton Beach posits two additional contentions. First, Hamilton Beach asserts that the '831 patent never defined the term "clip" at all; therefore, Sunbeam's argument that the meaning of the term "clip" changed is wrong because the term was not limited to any particular definition in the '831 disclosure. Second, even if the term "clip" was defined

---

Sunbeam. Presumably Hamilton Beach relies on the "Detailed Description of the Invention" section of specification comparison, which indeed appears to contain no substantive changes.

in the '831 patent and that definition changed, that change would only be a clarification to the '831 disclosure, and therefore not impermissible new matter.

Hamilton Beach's arguments are unpersuasive. As the '928 patent claims a slow cooker with "an over-the-center clip having a hook and a catch," where "one of the hook and catch [is] mounted on one of the lid and side wall of the housing and the other of the hook and catch [is] mounted on the other of the lid and side wall of the housing,"[5] it follows that the new matter issue in this case boils down to two fundamental questions: (1) Did the '831 patent disclose "clips" that included a catch? And (2) did the '831 patent disclose a configuration where a catch could be mounted on the side wall of the housing? As the answer to both of these questions is "No" it likewise follows that the '831 patent does not "contain[ ] a written description of the invention sufficient to allow persons of ordinary skill in the art to recognize that the inventor invented the subject matter that is claimed in the asserted claims," *Commonwealth Scientific*, 542 F.3d at 1379, of the '928 patent.

To begin, it is abundantly clear that the text of the '831 specification discloses "clips" that have a hook and a lever, but not a "catch," while the text of the '928 specification discloses "clips" that have a hook *and* a catch. Furthermore, the alternative phrasing of the "clip" language, "one of the hook and catch being mounted on one of the lid and side wall of the housing and the other of the hook and catch being mounted on the other of the lid and side wall of the housing," '928 Patent col.1 l.66–col.2 l.5, is conspicuously absent from the '831 patent. The notion that the '831 patent contemplated "clips" having a "catch," and that

---

[5] This claim language appears in independent claims 1, 3, and 6 of the '928 patent. '928 Patent col.8 ll.35–40; *id.* col.9 ll.8–13; *id.* col.10 ll.19–24. The relevant language in claim 6 contains trivial differences with the relevant language of claims 1 and 3, which is identical.

it further contemplated that the "catch" might be mounted to the side wall, then, strains

credulity.

This conclusion is supported by a closer look at the functioning of the invention

described in the '831 patent. Hamilton Beach does not appear to dispute that one purpose

of the '831 patent is to incorporate a slot capable of holding a utensil that is "removably

engageable with the handle of the [slow cooker] lid." '831 Patent col.10 ll.36–37. It is

evident from each figure disclosed in the '831 specification that a configuration with a

catch mounted on the side wall—and the hook and lever (i.e., the clip) mounted on the

lid—would interfere with the operation of the clip. *See* '831 Patent figs.1–4. It therefore is

no accident that although both the '831 and '928 patent specifications *disclose* a utensil

with a storage slot, the utensil and storage slot are only *claimed* in the '831 patent.

(*See* Expert Report of Lee A. Swanger, Ph.D., P.E., Def.'s Mem. Supp. Mot. Summ. J. Ex. 53, ¶

16.)

Hamilton Beach is also incorrect to suggest that acceptance of Sunbeam's new

matter argument is tantamount to limiting the '831 patent to a single embodiment.

Acceptance of Sunbeam's new matter argument does not limit the '831 patent to a single

embodiment, but rather only to what it in fact disclosed; a rejection of Sunbeam's

argument, by contrast, would expand the '831 disclosure to embodiments that were not

even suggested or contemplated. As explained above, the text of the '831 specification, and

the functioning of the invention described therein, fails to suggest a slow cooker having

"clips" that include a "catch" mounted to the side wall. Further, as Sunbeam points out, the

presence of terms such as "preferred" in the '831 specification does not indicate that a slow

cooker with a lever and hook mounted to the side wall and a catch mounted on the lid was

23

only a preferred embodiment. Instead, the use of such terms merely indicates that the catch

need not be integrated with the handle and might be shaped differently.

> It is preferred that the catch 42*a* be integrally formed with and extend
> outwardly from the handle 42, and, specifically from an end of the handle 42
> proximate the edge 40*a* of the lid 40. *While this configuration of the catch 42*a
> *is preferred*, it is not intended to be limiting. As such, it [is] further
> contemplated that the catch 42*a* be formed separately from the handle 42 or
> that the catch 42*a* be shaped differently than described above, provided the
> catch 42*a* is still capable of functioning as described herein.

'831 Patent col.5 ll.38–46 (emphasis added).

Sunbeam's argument, which the Court accepts, is elegant in its simplicity: Hamilton

Beach, by its own admission, wrote claims to cover Sunbeam's Cook & Carry. In doing so, it

had to redefine both the meaning and location of the "clip," injecting new matter into the

'928 patent to support its broader claims, as Sunbeam's "clip" was the '831's antithesis.

Consequently, Hamilton Beach cannot meet its burden to establish priority to the filing date

of the '831 application.

With the priority issue settled, Sunbeam's burden to prove invalidity by clear and

convincing evidence is a *fait accompli*. The '928 patent application was filed June 4, 2010,

making the relevant critical date for on-sale purposes June 4, 2009. Hamilton Beach admits

that its Stay or Go slow cookers are commercial embodiments of the '928 patent, and that it

has been selling Stay or Go slow cookers since at least as early as 2005. This renders the

'928 patent invalid under the on-sale and public use bars of 35 U.S.C. § 102(b). The '928

patent is also invalid as anticipated under § 102(a), as Hamilton Beach has not come

forward with evidence to rebut the presumptive invention date of June 4, 2010, and

Hamilton Beach admits that it was aware of Sunbeam's Cook & Carry as early as January

2010, and further that its patent attorney drafted claims specifically to cover the Cook &

24

Carry. For all of the reasons above, the Court will grant Sunbeam summary judgment on its

new matter defense.

## 2. On-sale bar

The on-sale bar applies, and will invalidate a patent, when "there was a definite sale

or offer for sale of the claimed invention prior to the critical date, defined as one year prior

to the U.S. filing date to which the application was entitled." *Linear Tech. Corp. v. Micrel, Inc.*,

275 F.3d 1040, 1047 (Fed. Cir. 2001) (quoting *Mas-Hamilton Grp., Inc. v. LaGard, Inc.*, 156

F.3d 1206, 1216 (Fed. Cir. 1998)) (internal quotation marks omitted). Sunbeam argues that

even if the '928 patent was entitled to the '831 patent's priority date—and as set forth

above, in the Court's opinion it is not—the '928 patent is nevertheless invalid under the on-

sale bar of 35 U.S.C. § 102(b).

Under the Supreme Court's decision in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55

(1998), the on-sale bar begins to run upon the satisfaction of two conditions. First, the

claimed invention "must be the subject of a commercial offer for sale." *Id.* at 67. "Only an

offer which rises to the level of a commercial offer for sale, one which the other party could

make into a binding contract by simple acceptance (assuming consideration), constitutes

an offer for sale under § 102(b)." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041,

1048 (Fed. Cir. 2001). Moreover, the invention that is the subject of the commercial offer

must inherently satisfy each claim limitation of the patent. *Scaltech, Inc. v. Retec/Tetra, LLC*,

269 F.3d 1321, 1329 (Fed. Cir. 2001). "Second, the invention must be ready for patenting."

*Pfaff*, 525 U.S. at 67. This condition may be satisfied in at least two ways: by proof that the

invention was reduced to practice before the critical date, "or by proof that prior to the

critical date the inventor had prepared drawings or other descriptions of the invention that

25

were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.*

at 67–68.

Application of the on-sale bar is a question of law. *Brasseler, U.S.A. I, L.P. v. Stryker*

*Sales Corp.*, 182 F.3d 888, 889 (Fed. Cir. 1999). An accused infringer asserting invalidity

based on the on-sale bar must demonstrate its conditions are met by clear and convincing

evidence. *Elan Corp. v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1340 (Fed. Cir. 2004).

The earliest possible priority date that the '928 Patent is entitled to is March 1,

2006—the date of the filing of the '831 Patent application. Therefore, the relevant critical

date is March 1, 2005.

### a. First condition: commercial offer for sale

Sunbeam asserts that Hamilton Beach's own documents prove that it made

commercial offers to sell its Stay or Go slow cooker, an embodiment of the '831 and '928

patents, to no less than seven customers before the critical date of March 1, 2005: ███████

████████████████████████████████████████████████████████

Sunbeam also claims that Hamilton Beach's supplier (i.e., the overseas manufacturer of the

Stay or Go), ██████, offered the Stay or Go for sale to Hamilton Beach. This is relevant as

well as there is no "supplier" exception to the on-sale bar. *See Special Devices, Inc. v. OEA,*

*Inc.*, 270 F.3d 1353, 1357–58 (Fed. Cir. 2001).

With respect to the seven retail customers, Sunbeam submits a veritable tome of

evidence chronicling meetings and presentations attended by Hamilton Beach

representatives and retail customers' buying agents. At these meetings and presentations,

Hamilton Beach presented concepts for its Stay or Go slow cooker, quoted prices (including

suggested retail prices, and retailer's costs or "invoice costs"), showed computer

26

presentation slides that included Computer Aided Design (CAD) drawings appearing to

depict slow cookers with all of the limitations claimed in the '928 Patent, and promised

dates by which the Stay or Go would be available. At least some of the presentation slides

referenced product model numbers that correspond with Stay or Go cookers, such as

"Model Number 33163."

Hamilton Beach emphasizes that while Sunbeam sets forth a great deal of evidence,

it glosses over the relevant standard established by the Federal Circuit in *Group One* with

respect to what constitutes a commercial offer for sale. To repeat the statement set forth

above, the *Group One* court said: "Only an offer which rises to the level of a commercial

offer for sale, *one which the other party could make into a binding contract by simple

acceptance* (assuming consideration), constitutes an offer for sale under § 102(b)." 254

F.3d at 1048 (emphasis added). Sunbeam's on-sale bar argument, according to Hamilton

Beach, "is entirely rooted in evidence of activity falling short of valid commercial offers"

under the law. Hamilton Beach asserts it was not in a position to offer the claimed

invention as part of a binding contract before the critical date, and more importantly, it

never made any "offers" to its customers as true contractual "offers" are understood in the

relevant market—the small kitchen appliance industry. Hamilton Beach explains that the

meetings and presentations (apparently known in the industry as product "line reviews")

attended by Hamilton Beach representatives and customer buying agents represent the

beginning of a customer's decision to buy, rather than the end. Indeed, Hamilton Beach

notes that Sunbeam's own group marketing manager affirmed that "line reviews" are "an

opportunity to present new products, whether [they are] in the conceptual phase or ready

to be marketed. And to just get feedback from the buyer, you know, do they like the

27

product, do they think it is something that their customers, their consumers will accept."
(Prelim. Inj. Hr'g Tr. 221:25–222:20.)

      To its point concerning what are understood as true commercial "offers" in the small kitchen appliance industry, Hamilton Beach states that vendor agreements and buyers' purchase order terms and conditions make clear that the *purchase order* forms the sales contract between the parties. Therefore, companies in the industry view purchase orders as offers to buy. Vendors such as Hamilton Beach or Sunbeam accept these purchase orders by shipping the product ordered or agreeing to ship the product. An exemplary vendor agreement cited by Hamilton Beach provides:



(Pl.'s Mem. Opp. Def.'s Mot. Summ. J. Ex. I, at HBB022880 (emphasis added).) A representative purchase order agreement provides, "███████████████████████████████████████████████████" (*Id.* Ex. FF, at HBB048474.) Another purchase order states, █████████████████████████ (*Id.* Ex. GG, at HBB022846 (internal quotation marks omitted).) Further, the only vendor agreement produced by Sunbeam states, *inter alia*, █████████████████ . . . ██████████████" and ██████████████." (*Id.* Ex. HH, at SB0032472.) In light of this evidence, Hamilton

28

Beach argues it is clear that companies in the relevant industry view their purchase orders as the *bona fide* offers to buy, and that the parties' customers would not understand communications at events such as line reviews as being formal "offers."

Hamilton Beach's argument that the purchase order forms the sales contract between the parties in the small kitchen appliance industry is persuasive. Hamilton Beach cites the Federal Circuit's unpublished opinion in *Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 300 F. App'x 904 (Fed. Cir. 2008), for the proposition that practice in the relevant industry—here, the small kitchen appliance industry—is relevant to whether Hamilton Beach's activities constitute a commercial offer for sale. *See id.* at 905–06. The court's prior opinion in *Lacks*, which instructed the district court to consider on remand whether "Lacks' documents of its sales activities r[o]se[ ] to a contractual offer for sale" in light of automobile industry practice, *id.* at 909, certainly stands for that proposition, despite the dissent's objection that "[s]uch industry-specific, local, and subjective criteria are a regression toward the imprecision of the discredited 'totality of the circumstances' . . . standard purposefully rejected by the Supreme Court in *Pfaff*." *Lacks*, 322 F.3d 1335, 1352 (Fed. Cir. 2003) (Newman, J., dissenting in part). In the dissent's view, "Determination of whether there has been an offer of sale in terms of § 102(b) requires objective application of uniform contract law, not indulgence based on disputed local custom in the automobile tire wheel cladding business." *Id.*

Under either view, Hamilton Beach is right to insist that the purchase order is dispositive. The language contained in the purchase orders and vendor agreements themselves strongly supports that it is the purchase order, and not other communications and interactions between the parties, that forms the sales contract. At the same time, the

29

testimony of Sunbeam's own representative strongly indicates that meetings, "line reviews," and communications related to them—even if laden with specific price terms (and especially invoice/cost price terms, in contrast with retail prices), availability dates, and model information—in reality serve purposes of forecasting and feedback, and not the consummation of the deal. Thus, the bulk of the evidence Sunbeam submits does not support the contention that Hamilton Beach's activities rose to the level of a commercial offer for sale that would form a contract upon simple acceptance with respect to any of the seven customers. They may have risen to that level under the pre-*Pfaff* and *Group One* case law, but *Pfaff* expressly rejected the flexible "totality" test in favor of "more precise requirements . . . to bring greater certainty to the analysis of the on-sale bar." *Group One*, 254 F.3d at 1047. It is the purchase agreements, and not line reviews, forecasts, and initial communications about upcoming product placements, that are important.

Hamilton Beach's interaction with its supplier, ▇▇▇▇, therefore becomes the critical issue, as the only evidence of a purchase order appears to be the purchase order submitted by Hamilton Beach to ▇▇▇▇ for inventory stock-piling purposes. As noted above, any transaction between Hamilton Beach and ▇▇▇▇ is just as potentially invalidating as any other transaction, as there is no "supplier" exception to the on-sale bar. *OEA*, 270 F.3d at 1357–58.

Before looking more closely at Hamilton Beach's purchase order, a wrinkle with respect to the relevant "offer" should be addressed. In the small kitchen appliance industry, and indeed in a typical commercial scenario where a manufacturer such as Hamilton Beach transmits a purchase order to a vendor or supplier such as ▇▇▇▇, the buyer makes the initial contractual communication, which is an offer to *buy*. The vendor objectively

30

manifests its acceptance by shipping the product ordered or by agreeing to ship it. Viewed from a formal perspective, then, there is no offer for *sale*. Fortunately, the Federal Circuit's opinion in *Micrel* addresses this issue. *Micrel* indicates that where there is an offer to *buy* the invention in the form of a purchase order, the question becomes whether the offeree accepts the offer to buy before the critical date, "because if so, [the offeree] entered into a binding contract to sell the [invention] that invalidates the . . . patent." 275 F.3d at 1052.

Purchase Order Number ▮▮▮ ("▮▮▮▮"), bearing Hamilton Beach's logo and the signature of its authorized agent, is dated February 8, 2005, and directed to vendor ▮▮▮▮▮▮▮▮▮▮▮" in "▮▮▮▮▮▮▮▮▮▮▮." (Def.'s Mem. Supp. Mot. Summ. J. Ex. 29, at HBB048493.) The shipping address is a Hamilton Beach facility in Memphis, Tennessee, and the billing address is a Hamilton Beach facility in Glen Allen, Virginia. (*Id.*) ▮▮▮▮ requests ▮▮▮ units of slow cooker model 33163TC, admitted by Hamilton Beach to be a Stay or Go slow cooker (Tidey Dep. 67; *see also* Def.'s Mem. Supp. Mot. Summ. J. Ex. 17, at HBB017188), which would inherently satisfy each claim limitation of the '928 Patent, at a unit price of "▮▮▮▮." (*Id.* Ex. 29, at HBB048493.) The purchase order is therefore unequivocally an offer to *buy* the invention. The question becomes whether or not ▮▮▮ ever accepted the purchase order and completed the contract.

Sunbeam acknowledges that the parties never entered into a formal contract. (*Id.* at 32.) It argues, however, that the parties' pre-critical date conduct confirms ▮▮▮ agreed to manufacture and sell at least ▮▮▮ pieces of the Stay or Go slow cooker, and more to the point, that the pre-critical date conduct "recognized the existence of a contract for ▮▮▮ to manufacture and sell the Stay or Go slow cooker to Plaintiff." (*Id.* at 31.)

31

Sunbeam's evidence with respect to ███████s acceptance is an email thread

between a Hamilton Beach representative named Ken Dail and a ███████ representative

named "Autumn." (*Id.* Ex. 71.) All emails in the thread are dated February 25, 2005. In the

initial email, Dail writes to Autumn, "Have you received the ship plan for this model?"

Autumn responds:



Any question, please contact us without hesitance.

Best wishes,
Yours truly,
Autumn

(*Id.* at HBB024624–25.)

Sunbeam looks to the Uniform Commercial Code ("UCC"), and specifically UCC § 2-

207(3), providing that "[c]onduct by both parties which recognizes the existence of a

contract is sufficient to establish a contract for sale although the writings of the parties do

not otherwise establish a contract," to support its contention that the pre-critical date

conduct of the parties recognized the existence of a contract for ███████ to manufacture

and sell the Stay or Go to Hamilton Beach. The UCC is undoubtedly an important reference

point, as the *Group One* court indicated that "[a]s a general proposition," 254 F.3d at 1047,

it would look to the UCC "to define whether . . . a communication or series of

communications rises to the level of a commercial offer for sale." *Id.* But the *Group One*

32

Case 3:1 Case 03:11-5-RS Document 194 (Ex Parte) 125 File 07/13/12 Page 33 of 40
PageID# 7474

court specifically held that commercial offer analysis should be guided not only by the UCC, but "under the law of contracts as generally understood," *id.*, for "there is a substantial body of general contract law, widely shared by both state and federal courts, to which courts can resort in making these determinations." *Id.* at 1048 (citing Arthur Linton Corbin, *Corbin on Contracts* (1964); John D. Calamari & Joseph M. Perillo, *The Law of Contracts* (4th ed. 1998)); *see also Scaltech*, 269 F.3d at 1328 (noting the commercial offer determination is governed by federal common law). Indeed, the *Group One* court noted "[t]he Supreme Court has . . . cited the Restatement of Contracts with approval in the commercial contract law context." *Id.* (citing *Mobil Oil, Inc. v. United States*, 530 U.S. 604, 606–10 (2000)).

While a contract may not necessarily be established under the familiar UCC "battle of the forms" provision cited by Sunbeam, UCC § 2-207(3), as that provision's reference to "conduct" refers principally to performance curing an otherwise unenforceable agreement, *see, e.g.*, Richard A. Lord, 2 *Williston on Contracts* § 6:19 (4th ed.) (Westlaw, updated May 2012), the Court has little difficulty concluding the email presents sufficient evidence of acceptance, and thus of the existence of a contract, under general contract law principles.

Under those principles, "to accept an offer an offeree must make a manifestation of assent to the offeror." *Micrel*, 275 F.3d at 1052 (citing Richard A. Lord, *Williston on Contracts* § 4:1 (4th ed. 1990)). "In order to be effective, an acceptance must *objectively* manifest the offeree's assent." *Id.* (citing *Superior Boiler Works, Inc. v. R.J. Sanders, Inc.*, 711 A.2d 628, 633 (R.I. 1998)). The email from ██████'s representative—in response to Hamilton Beach's query of when ██████ "████████████████████████████," confirmed receipt of the purchase order at issue, ██████; acknowledged the specific quantity ordered (████ pcs) of the model 33163 slow cooker; stated that "████████████

33

█████ ███████████████████████████████████"; described the arranging of "QC inspection"; and promised a ship date. This is sufficient evidence of an objective manifestation of assent on the part of ████████, and of an invalidating sale under § 102(b).

Hamilton Beach protests that the designation of "F.O.B. ██████" on ███████ "means that Hamilton Beach would take possession of any purchased goods once the containers were loaded onto the ship in █████," and that "any such sale would not have been consummated in the United States, as required under 35 U.S.C. § 102(b)." Offers for sale made by foreign parties that are directed to United States customers at their place of business in the United States, however, qualify as invalidating sales under § 102(b). *See In re Caveney*, 761 F.2d 671, 676–77 (Fed. Cir. 1985); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1376–77 (Fed. Cir. 1998) (Mayer, C.J., concurring); *id.* at 1358 (Newman, J., dissenting). If offers for sale made by foreign parties and directed to U.S. customers qualify as invalidating sales, the Court can discern no reason why an accepted offer to buy by a United States customer directed to a foreign entity should not also qualify. Accordingly, the Court finds that *Pfaff*'s first condition—that the claimed invention be subject to a commercial offer for sale—is satisfied by the ████████ transaction.

### b. Second condition: ready for patenting

The second condition necessary to trigger the on-sale bar is that the product be "ready for patenting." This condition is satisfied if, prior to the critical date, (1) the invention was reduced to practice or (2) "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67–68. An invention is reduced to practice when it functions according to its intended purpose. *Atlanta Attachment Co. v. Leggett &*

34

*Platt, Inc.*, 516 F.3d 1361, 1366 (Fed. Cir. 2008). The invention functions according to its
intended purpose, in turn, "when there is a demonstration of its workability or utility." *Id.*
at 1367.

Hamilton Beach argues that just as the invention was not ready to be offered for sale
prior to the critical date, so too was the invention not yet ready for patenting. The Court
will assume this argument for purposes of decision, because Sunbeam has submitted
strong evidence that Hamilton Beach prepared, prior to the critical date, drawings and
other descriptions of the invention that would have been sufficiently specific to enable a
person having ordinary skill in the art to practice the invention.

*Pfaff* expressly taught that while reduction to practice ordinarily constitutes the best
evidence that an invention is complete, it is not the only sufficient evidence:

> [J]ust because reduction to practice is sufficient evidence of completion, it
> does not follow that proof of reduction to practice is necessary in every case.
> Indeed, both the facts of *The Telephone Cases* and the facts of this case
> demonstrate that one can prove that an invention is complete and ready for
> patenting before it has actually been reduced to practice.

525 U.S. at 66. In *The Telephone Cases*, the Supreme Court upheld issuance of a patent to
Alexander Graham Bell even though he filed his application before constructing a working
telephone. The Court noted that his "specification . . . did describe accurately and with
admirable clearness his process . . . and he also described, with sufficient precision to
enable one of ordinary skill in such matters to make [his telephone.]" 126 U.S. 1, 535
(1888). The Court concluded this was enough, for "[t]he law does not require that a
discoverer or inventor, in order to get a patent . . . must have succeeded in bringing his art
to the highest degree of perfection." *Id.* at 536.

Sunbeam argues that as

35

the Stay or Go slow cooker, aside from the clips and the gasket, is an ordinary slow cooker, the [CAD] drawings, model, and product description shown to ███████ and [Hamilton Beach's] other customers are specific enough to enable one of skill in the art to practice the invention of the '928 patent. Clearly, the invention claimed in the '928 patent is a simple mechanical device for which a CAD drawing, a model, and a list of basic product features more than constitutes an enabling disclosure.

(Def.'s Mem. Supp. Mot. Summ. J. 33–34.)

*Pfaff* and Federal Circuit precedent applying it make clear that what is important is that person having ordinary skill in the art could practice the invention at the relevant time with drawings, descriptions, and similar tools. To this point, the Federal Circuit has noted on multiple occasions that the need to complete "fine-tuning" of an invention after its sale will not "undermine the conclusion that the invention is ready for patenting." *STX, LLC v. Brine, Inc.*, 211 F.3d 588, 591 (2000) (citing *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1332–34 (Fed. Cir. 1998)). Further, the *STX* court indicated that the sale of the product in a commercial quantity would also tend to negate the conclusion that the product was not ready for patenting. *Id.* With these cases and principles in mind, the detailed CAD drawings and descriptions from Hamilton Beach's meetings with retail customers, along with an invalidating sale where some ████ units of the Stay or Go were ordered, amply show that the invention was ready for patenting.

In light of the ██████ transaction and the sophisticated and detailed drawings and descriptions of the invention in evidence, Sunbeam has met its burden of proving its § 102(b) on-sale bar defense by clear and convincing evidence. The Court therefore grants summary judgment of invalidity on this ground.

36

### 3.    Public use bar

Citing the apparent nonconfidential nature of Hamilton Beach's interactions with retail buyers described in the on-sale bar evidence above (Sunbeam notes that presentations were not marked as confidential, there were no nondisclosure agreements entered into by the parties, and that Hamilton Beach even made attempts to verify Sunbeam's strategies in presenting its products to retailers), Sunbeam argues the '928 patent must also be invalidated under the public use bar of 35 U.S.C. § 102(b). Hamilton Beach responds that *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376 (Fed. Cir. 2007), which held that the public use bar is only triggered where the claimed invention is used for its intended purpose, demands dismissal of Sunbeam's public use defense.

In *Motionless Keyboard,* the inventor of two patented ergonomic keyboard devices disclosed his invention "to his business partner, potential investors, a friend, and a typing tester before the critical date." *Id.* at 1383–84. In all of the disclosures but one, the keyboard device had not been connected to a computer. *Id.* at 1385. And in the disclosure where the keyboard device was connected to a computer, a binding nondisclosure agreement was signed. *Id.* Under these circumstances, the Federal Circuit held that the invention had not been used for its intended purpose—"to transmit data in the normal course of business." *Id.* The disclosures instead only "visually displayed" the invention "without putting it into use." *Id.*

Hamilton Beach contends, and the Court agrees, that its interactions with retail buyers are indistinguishable from the disclosures in *Motionless Keyboard*. Hamilton Beach's invention was only *described*, and not *used*, for its intended purpose in the line review presentations it conducted for its customers—indeed, Hamilton Beach points out that any

37

slow cooker models shown at the line reviews were nonfunctioning products that did not

have a power cord. (Tidey Dep. 38:18–39:7.) Under these facts, Sunbeam has not met its

burden to establish its public use defense. The Court therefore denies Sunbeam summary

judgment on this ground.

### 4.     Obviousness

A patent claim is invalid as obvious "if the differences between the subject matter

sought to be patented and the prior art are such that the subject matter as a whole would

have been obvious at the time the invention was made to a person having ordinary skill in

the art." 35 U.S.C. § 103(a). The Supreme Court's decision in *KSR International Co. v.

Teleflex, Inc.*, 550 U.S. 398 (2007), reaffirmed four factors derived from *Graham v. John

Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966), that serve as the guide for the Court's

obviousness inquiry: (1) the scope and content of the prior art; (2) the differences between

the prior art and the asserted claims; (3) the level of ordinary skill in the art; and (4) any

secondary considerations of obviousness. *KSR*, 550 U.S. at 406, 415.

The Court can properly grant Sunbeam's motion for summary judgment on the

ground of obviousness only if the "factual inquiries into obviousness present no genuine

issue of material facts." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir.

2011) (quoting *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 1991)) (internal

quotation marks omitted). Obviousness is a question of law, based on underlying facts. *Id.*

(citing *Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1337 (Fed. Cir. 2010)).

Sunbeam argues that each and every element of the '928 patent claims is known in

the prior art. Pointing to those elements and the patents in which they are disclosed in a

bulleted list, Sunbeam asserts that it is commonsensical that one of ordinary skill in the art

38

would look to cooking and food containment to devise a slow cooker with a sealable lid that would allow the cooker to be transported. Noting over-center-clips have been used to seal lids or covers for cooking vessels and food containers since the early twentieth century, Sunbeam argues it would have been obvious to combine a gasket and over-the-center clips for their well-known functions of sealing and containment to create a "securely transportable slow cooker." (Def.'s Mem. Supp. Mot. Summ. J. 41.) "Put simply, the inventors slapped over-the-center clips onto a slow cooker to provide an additional, obvious solution to the known problem of safely and conveniently transporting slow cookers." (*Id.*) Sunbeam then proceeds to list prior art combinations that it asserts would have been obvious to combine with respect to each asserted claim.

Sunbeam devotes significant energy to secondary considerations relevant to the obviousness inquiry, but those considerations need not be covered in significant detail, because the Court agrees with Hamilton Beach that Sunbeam cannot merely present a list of prior art combinations and then leave it to the Court to determine how the references fit together to render the claims obvious. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008). Because Sunbeam has failed to set forth sufficient evidence showing *why* it would have been obvious to combine elements from the prior art references it cites, the Court denies Sunbeam summary judgment on this ground.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS Sunbeam Products, Inc.'s Motion, and DENIES Hamilton Beach Brands, Inc.'s Motion.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

It is SO ORDERED.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this __13th__ day of July 2012

40

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

HAMILTON BEACH BRANDS, INC.,

                                    Plaintiff,

         v.                                                    Action No. 3:11-CV-345

SUNBEAM PRODUCTS, INC.,
d/b/a JARDEN CONSUMER SOLUTIONS,

                                    Defendant.

## **FINAL ORDER**

THIS MATTER is before the Court on Plaintiff Hamilton Beach, Inc.'s Motion for

Summary Judgment of Infringement and No Invalidity Based on the Addition of New Matter

(Doc. No. 115), and Defendant Sunbeam Products, Inc.'s Motion for Summary Judgment of

Non-Infringement and Invalidity (Doc. No. 121). For the reasons stated in the

accompanying Memorandum Opinion, the Court DENIES Plaintiff's Motion and GRANTS

Defendant's Motion.

Let the Clerk send a copy of this Order to all counsel of record.

It is SO ORDERED.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this __13th___ day of July 2012



US007947928B2

(12) **United States Patent**
Tynes et al.

(10) Patent No.: **US 7,947,928 B2**
(45) Date of Patent: *May 24, 2011

(54) **SLOW COOKER**

(75) Inventors: **Ronald G. Tynes**, Colchester, VT (US);
**John D. Barnes**, Richmond, VA (US);
**Guoyao Ye**, Richmond, VA (US)

(73) Assignee: **Hamilton Beach Brands, Inc.**, Glen
Allen, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

This patent is subject to a terminal dis-
claimer.

(21) Appl. No.: **12/794,284**

(22) Filed: **Jun. 4, 2010**

(65) **Prior Publication Data**

US 2010/0230398 A1     Sep. 16, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 12/255,188, filed on
Oct. 21, 2008, which is a continuation of application
No. 11/365,222, filed on Mar. 1, 2006, now Pat. No.
7,485,831.

(51) **Int. Cl.**
*F27D 11/00*     (2006.01)
*B65D 41/56*     (2006.01)

(52) **U.S. Cl.** ........ 219/433; 219/438; 220/521; 220/214;
220/265; 220/212; 220/780; 220/735; 220/288;
220/212.5; 206/217; 206/541; 206/542; 206/553;
206/216

(58) **Field of Classification Search** ................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,698,928 A | 1/1929 | Wentorf | |
| D129,108 S * | 8/1941 | Sprague | D3/268 |
| 3,577,908 A | 5/1971 | Burg | |
| 3,769,899 A | 11/1973 | Kostko | |
| 3,791,368 A | 2/1974 | Hunt | |

(Continued)

FOREIGN PATENT DOCUMENTS

| CH | 245961 A | 12/1946 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

Ella Grace, Inc., SecureLida Product Description and Key Features,
2 pages (2004).

*Primary Examiner* — Shawntina Fuqua
(74) *Attorney, Agent, or Firm* — Panitch Schwarze Belisario
& Nadel LLP

(57)     **ABSTRACT**

A slow cooker for heating food stuffs includes a housing
defining a heating cavity and a housing rim. A heating ele-
ment is disposed within the housing to heat the heating cavity.
A container has a generally hollow interior and a container
rim and is shaped and sized to fit within the heating cavity for
heating thereof by the heating element. A lid is sized and
shaped to at least partially cover an opening of the container
and includes a gasket around an outer edge thereof for sealing
engagement with the container rim. The slow cooker further
includes at least one clip for selectively retaining the lid in
sealing engagement with the container rim to inhibit leakage
of the food stuffs. The at least one clip is an over-the-center
clip and includes a hook and a catch to selectively retain the
lid in sealing engagement with the container rim.

**7 Claims, 5 Drawing Sheets**



## US 7,947,928 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,375,711 A | 3/1983 | Franzen et al. |
| 4,492,853 A | 1/1985 | Lam |
| D298,899 S | 12/1988 | Blum et al. |
| D307,531 S | 5/1990 | Ishida |
| D313,727 S | 1/1991 | Gamez |
| 5,046,633 A | 9/1991 | Chung |
| 5,097,107 A | 3/1992 | Watkins et al. |
| 5,129,314 A | 7/1992 | Hu |
| D338,370 S | 8/1993 | Takeda |
| D341,058 S | 11/1993 | Slany et al. |
| 5,337,910 A | 8/1994 | Picozza et al. |
| 5,415,082 A | 5/1995 | Nagao |
| D370,826 S | 6/1996 | Thurlow |
| 5,643,481 A | 7/1997 | Brotzki et al. |
| 5,678,790 A | 10/1997 | Dwyer |
| 5,683,010 A | 11/1997 | Boyajian, Jr. |
| 5,829,342 A | 11/1998 | Lee |
| 5,834,046 A | 11/1998 | Turpin et al. |
| 5,951,899 A | 9/1999 | Eichler et al. |
| 5,957,323 A | 9/1999 | Terracciano et al. |
| D416,434 S | 11/1999 | Pollnow |
| 6,002,111 A | 12/1999 | Beugnot et al. |
| D420,246 S | 2/2000 | Alonge et al. |
| 6,032,822 A | 3/2000 | Munari |
| D425,360 S | 5/2000 | Dobson et al. |
| D427,483 S | 7/2000 | Geelen et al. |
| D429,596 S | 8/2000 | Hlava et al. |
| 6,102,238 A | 8/2000 | Brady et al. |
| 6,105,810 A | 8/2000 | Daenen et al. |
| D434,266 S | 11/2000 | Dobson et al. |
| D434,940 S | 12/2000 | Hlava et al. |
| 6,172,339 B1 | 1/2001 | Thevenin |
| 6,175,105 B1 | 1/2001 | Rubbright et al. |
| 6,234,067 B1 | 5/2001 | Schmidt |
| D444,664 S | 7/2001 | Dobson et al. |
| D444,993 S | 7/2001 | Dobson et al. |
| 6,262,398 B1 | 7/2001 | Busquets et al. |
| 6,429,408 B2 | 8/2002 | Muskalla et al. |
| 6,435,358 B1 | 8/2002 | Decal |
| D468,163 S | 1/2003 | Blake et al. |
| 6,571,975 B1 | 6/2003 | Fay |
| 6,601,726 B2 | 8/2003 | Bianco et al. |
| 6,705,209 B2 | 3/2004 | Yang et al. |
| 6,748,853 B1 | 6/2004 | Brady et al. |
| D492,882 S | 7/2004 | Liu |
| D496,555 S | 9/2004 | Rommelfanger et al. |
| 6,872,921 B1 | 3/2005 | DeCobert et al. |
| D503,584 S | 4/2005 | White et al. |
| 6,884,971 B2 | 4/2005 | Li |
| D506,350 S | 6/2005 | Cheng |
| D507,452 S | 7/2005 | Chan |
| D507,718 S | 7/2005 | Kellermann et al. |
| D508,817 S | 8/2005 | Kellermann et al. |
| 6,987,247 B2 * | 1/2006 | Schaffeld et al. ............ 219/438 |
| 7,175,041 B2 * | 2/2007 | Eckert .......................... 220/212 |
| 2003/0024936 A1 | 2/2003 | Niese |
| 2004/0079747 A1 | 4/2004 | Wang |
| 2005/0145615 A1 | 7/2005 | Schaffeld et al. |
| 2010/0251902 A1 | 10/2010 | Schandel et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 311246 A | 5/1916 |
| DE | 301471 C | 1/1917 |
| DE | 2934215 A1 | 4/1981 |
| FR | 1024229 A | 3/1953 |

* cited by examiner



*Fig. 1*



*Fig. 2*



Fig. 3



**Fig. 4**



*Fig. 5*

*Fig. 6*

US 7,947,928 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## SLOW COOKER

### CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 12/255,188, filed Oct. 21, 2008 and entitled "Slow Cooker," which is a continuation of U.S. Pat. No. 7,485,831, filed Mar. 1, 2006 and entitled "Slow Cooker."

### BACKGROUND OF THE INVENTION

The present invention relates to slow cookers and, in particular, to a slow cooker which can be relatively easily transported with little to no spillage of any contents therein.

Slow cookers are generally known and typically include a ceramic or stoneware container received in a metal housing. Typically, a transparent glass or plastic lid is removably mounted on the container. The housing typically has an electrically-operated control and heating element for heating food stuffs placed within the container. The housing generally has handles extending therefrom to allow a user to relatively easily pick up and move the slow cooker. Often, the user may want to move the slow cooker after it is loaded with the food stuffs to be cooked.

However, the containers and the lids of slow cookers are not usually made to close tolerances, and the lids are typically not securely engaged with the containers. This creates a potential for the lid to slide off the container when the slow cooker is being carried from one location to another. Also, because foods cooked in a slow cooker typically have a significant liquid content, there exists the potential of significant spillage if the container is tilted while the slow cooker is moved.

Additionally, spoons and/or other utensils are typically required for tending to and/or serving food stuffs within the slow cooker. However, if the slow cooker is desired to be moved, the user must typically separately carry such utensils. Because of this, there exists the potential of dropping the utensil while the user attempts to move the slow cooker.

For this reason, it would be desirable to provide a slow cooker with a sealing lid that can be retained on the container to inhibit leakage of food stuffs from within the container, particularly during movement. It would further be desirable to have a utensil that can be removably engaged with the slow cooker to enable the user to relatively easily carry the slow cooker and the utensil at the same time.

### BRIEF SUMMARY OF THE INVENTION

Briefly stated, the present invention is a slow cooker for heating of food stuffs. The slow cooker includes a housing having a base and a side wall extending therefrom to define a heating cavity within the housing. The housing further has a housing rim at a first, free edge of the side wall defining an opening to the heating cavity. A heating element is disposed within the housing sufficiently proximate the heating cavity to heat the heating cavity. A container has a generally hollow interior and a container rim defining an opening for accessing the interior. The interior is capable of retaining the food stuffs therein. The container is shaped and sized to fit within the heating cavity of the housing for heating thereof by the heating element. A lid is sized and shaped to at least partially cover the opening of the container when placed on the container rim. The lid has a gasket around an outer edge thereof for sealing engagement with the container rim. The slow cooker further includes at least one clip mounted between the

lid and the side wall of the housing, the at least one clip being an over-the-center clip having a hook and a catch, one of the hook and catch being mounted on one of the lid and side wall of the housing and the other of the hook and catch being mounted on the other of the lid and side wall of the housing. The at least one clip is selectively engageable with the lid and side wall of the housing to selectively retain the lid in sealing engagement with the container rim to inhibit leakage of the food stuffs from the interior of the container. The housing and lid have a vertical height and the at least one clip is disposed entirely within the vertical height of the housing and lid to facilitate storage and transport of the slow cooker when the at least one clip is engaged with the lid and side wall of the housing.

### BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

The foregoing summary, as well as the following detailed description of a preferred embodiment of the invention, will be better understood when read in conjunction with the appended drawings. For the purpose of illustrating the invention, there is shown in the drawings an embodiment which is presently preferred. It should be understood, however, that the invention is not limited to the precise arrangements and instrumentalities shown.

In the drawings:

FIG. 1 is a top front perspective view of a slow cooker in accordance with a preferred embodiment of the present invention;

FIG. 2 is a front elevational view of the slow cooker of FIG. 1;

FIG. 3 is a top plan view of the slow cooker of FIG. 1;

FIG. 4 is an exploded perspective view of the slow cooker of FIG. 1;

FIG. 5 is a bottom perspective view of a lid of the slow cooker of FIG. 1; and

FIG. 6 is an enlarged cross-sectional view of an edge of the lid taken along line 6-6 of FIG. 5.

### DETAILED DESCRIPTION OF THE INVENTION

Certain terminology is used in the following description for convenience only and is not limiting. The words "right", "left", "upper", and "lower" designate directions in the drawings to which reference is made. The terminology includes the words above specifically mentioned, derivatives thereof, and words of similar import.

Referring to the drawings in detail, wherein like numerals indicate like elements throughout, there is shown in FIGS. 1-6 a preferred embodiment of a slow cooker, indicated generally at 10, for warming and for cooking, collectively referred to as heating, of food stuffs (not shown).

Referring to FIGS. 1, 2, and 4, the slow cooker 10 includes a housing 20 having a base 20a and a side wall 20b extending therefrom to define a heating cavity 20c within the housing 20. Preferably, the base 20a is generally ovular in shape when viewed from above or below with the side wall 20b extending generally perpendicularly upwardly therefrom. While the ovular shape is preferred, it is within the spirit and scope of the present invention that the base 20a have a different shape, such as, but not limited to, circular in plan view. The housing 20 further has a housing rim 20d at an upper first, free edge of the side wall 20b defining an opening 20e to the heating cavity 20c. Preferably, the base 20a includes three generally spaced apart, rounded protrusions or feet 28 (FIG. 2) extending downwardly from a bottom surface thereof for supporting the

US 7,947,928 B2

3

slow cooker 10 on a surface (not shown) and preferably spacing the base 20a slightly from the surface. While it is preferred that the slow cooker 10 includes three feet 28, it is within the spirit and scope of the present invention that there be more or less than three feet 28 or that the feet 28 be shaped differently, provided the feet 28 are capable of functioning in the manner described herein. Additionally, it is contemplated that the slow cooker 10 include no feet and that the slow cooker 10 be supported by the bottom surface of the base 20a. Preferably, the components of the housing 20 are formed from metallic materials, such as aluminum, stainless steel, or another suitable metallic material, or some combination of metallic materials. While it is preferred that the components of the housing 20 be formed from metallic materials, it is within the spirit and scope of the present invention that one or more of the components be formed from other, non-metallic materials, provided the housing 20 is capable of functioning as described herein.

Referring specifically to FIG. 2, a heating element 14 is disposed within the housing 20 sufficiently proximate the heating cavity 20c to heat the heating cavity 20c. Preferably, the heating element 14 is disposed within the base 20a of the housing 20, although it is within the spirit and scope of the present invention that the heating element 14 be located within or on the side wall 20b of the housing 20 in addition to or instead of the base 20a. The heating element 14 is preferably generally conventional, in that it is preferably electrically powered and is a resistance-type heating element, such as a calrod or mica board heating element. Although such a heating element 14 is preferred, it is within the spirit and scope of the present invention that a different type of heating element be used, provided the heating element functions to heat the heating cavity 20c of the housing 20. Preferably, a control knob 12 extends outwardly from the side wall 20b of the housing 20 to enable a user to control the heating element 14. For instance, it is preferred that rotation of the knob 12 by the user toggles the heating element 14 between at least one on setting and an off setting. It is further preferred that the heating element 14 have at least two on settings, specifically a high heat setting and a low heat setting. Although two heat settings are preferred, it is further contemplated that alternate configurations that are generally conventional in the art be used, such as, but not limited to, rotation of the knob 12 actuating a thermostat (not shown) to cause the heating element 14 to heat the heating cavity 20c to a specific user selected temperature.

Referring to FIG. 4, the slow cooker 10 further includes a container 30 having a generally hollow interior 30a and a container rim 30b defining an opening 30c for accessing the interior 30a. The interior 30a is capable of retaining the food stuffs therein. The container 30 is preferably shaped and sized to fit within the heating cavity 20c of the housing 20 for heating thereof by the heating element 14. The container 30 is preferably made of stoneware or ceramic, as is conventional in the slow cooker art. While a stoneware or ceramic container is preferred, it is within the spirit and scope of the present invention that the container 30 be made of a different material, such as cast iron with a porcelain enamel coating, for instance, provided the container 30 is capable of functioning as described herein. Additionally, it is preferable that the container 30 be easily removable from the housing 20 to facilitate cleaning thereof without exposing the housing 20, and specifically the heating element 14 and other electrical components thereof, to water and/or cleaning detergents or solvents.

Referring to FIGS. 1 and 3-6, the slow cooker 10 further includes a lid 40 sized and shaped to at least partially and

4

preferably generally completely cover the opening 30c of the container 30 when the lid 40 is placed on the container rim 30b. The lid 40 is preferably generally ovular when viewed from above or below to correspond to the shape of the opening 30c of the container 30. Preferably, when placed on the container rim 30b, the lid 40 entirely covers the opening 30c of the container 30. The lid 40 is preferably predominantly made of glass, although it is contemplated that the lid be made of a different, preferably transparent or translucent material, such as a polymeric material, for instance, provided the lid 40 functions as described herein. The lid 40 preferably includes an elongate handle 42 on a top surface thereof, preferably disposed generally along a major axis of the preferably ovular lid 40. The handle 42 is preferably formed from a polymeric material, such as, but not limited to, plastic, and is affixed to the lid 40 via fasteners, such as bolts, screws, rivets, or some other suitable fastener. Alternatively, it is contemplated that the handle 42 could be affixed to the lid 40 using an adhesive or some other fastening method. Moreover, while it is preferred that the handle 42 be separately formed and affixed to the lid 40, it is within the spirit and scope of the present invention that the lid 40 be made of a polymeric material, such as plastic, and that the handle be integrally formed with the lid 40. The handle 42 preferably has a slot 44 formed therein by a pair of generally parallel side walls 44a extending upwardly from the top surface of the lid 40. Further aspects of the slot 44 will be discussed in greater detail below.

Referring specifically to FIGS. 5 and 6, an edge 40a of the lid 40 is preferably formed by a ring 48 disposed around the lid 40. The ring 48 is preferably made from stainless steel, although it is within the spirit and scope of the present invention that another material be used, provided it is capable of functioning as described herein. Preferably, the ring 48 functions to retain a gasket 46 disposed along a bottom edge surface of the lid 40. Preferably, the gasket 46 includes a tab 46a extending therefrom, a portion of which is preferably pinched between the ring 48 and a bottom surface of the lid 40. In this way, the gasket 46 is retained along the bottom edge surface of the lid 40. Preferably, the gasket 46 is made of silicone, although it is within the spirit and scope of the present invention that another material be used to form the gasket 46, provided the gasket 46 is capable of functioning as described herein. The gasket 46 preferably functions to sealingly engage the lid 40 with the container rim 30b when the lid 40 is placed thereon.

Referring to FIGS. 1 and 4, the slow cooker 10 further includes a utensil 50 for manipulating the food stuffs within the container 30. The utensil 50 is preferably a large serving spoon or ladle, although it is within the spirit and scope of the present invention that the utensil be of another type, such as a fork, spatula, or the like. The utensil or spoon 50 is preferably removably engagable with the handle 42 of the lid 40. Specifically, the slot 44 of the handle 42 is preferably appropriately sized to accept at least a portion of the spoon 50. Preferably, the spoon 50 includes a bowl 50a attached at one end of a stem or handle 50b. At least a portion of the handle 50b is sized to fit within the slot 44 so that the spoon 50 can rest within the slot 44 on top of the lid 40 in a storage or resting position, as shown in FIG. 1. The side walls 44a of the slot 44 preferably each include at least one detent or protrusion 44b extending inwardly therefrom to at least assist in retaining the spoon 50 within the slot 44.

Referring now to FIG. 3, it is preferable that each side wall 44a include two spaced apart protrusions 44b extending inwardly therefrom which engage the handle 50b of the spoon 50 with a snap fit to retain the spoon 50 within the slot 44. While this configuration is preferred, it is within the spirit and

US 7,947,928 B2

5

scope of the present invention that the slot 44 include more or less than four protrusions 44b therein to retain the spoon 50 therein. Moreover, it is contemplated that the slot 44 include no protrusions and that the spoon 50 be retained within the slot 44 by a friction fit created between the side walls 44a with the spoon 50 or that the spoon 50 merely rest within the slot 44 without any engagement thereof by the slot 44. In either event, it is preferred that the spoon 50 be able to be removed from within the slot 44 with a minimal amount of force being applied to the spoon 50 by the user.

Referring to FIGS. 1 and 2, the slow cooker 10 includes at least one clip 22 for selectively retaining the lid 40 in sealing engagement with the container rim 30b to inhibit leakage of the food stuffs from within the interior 30a of the container 30. The at least one clip 22 is a generally conventional over-the-center clip having a hook 22a and a lever 22b, such that manipulation of the lever 22b causes engagement or release of the hook 22a of the clip 22. The at least one clip 22 is preferably attached to the side wall 20b of the housing 20, proximate the top thereof, with the hook 22a shaped to be extendable from the lever 22b and around the container rim 30b when the container 30 is disposed within the heating cavity 20c of the housing 20. Preferably, the hook 22a is selectively releasably engagable with the lid 40 with movement of the lever 22b to selectively retain the lid 40 in sealing engagement with the container rim 30b. Specifically, it is preferred that, when in an engaged position 23, the at least one clip 22 retains the lid 40 in sealing engagement with the container rim 30b, and, when in a released position 25, the hook 22a is removed from engagement with the lid 40 so that the lid 40 can be removed from the container 30 in order to allow access to the interior 30a of the container 30. It is preferred that the lid 40 includes at least one catch 42a in the form of a small, slightly hooked, elongate protrusion extending outwardly from the lid 40 to selectively engage the hook 22a of the clip 22. It is preferred that the catch 42a be integrally formed with and extend outwardly from the handle 42, and, specifically from an end of the handle 42 proximate the edge 40a of the lid 40. While this configuration of the catch 42a is preferred, it is not intended to be limiting. As such, it is further contemplated that the catch 42a be formed separately from the handle 42 or that the catch 42a be shaped differently than described above, provided the catch 42a is still capable of functioning as described herein.

When the hook 22a is placed around the catch 42a, the lever 22b of the clip 22 can be rotated downwardly and inwardly toward the side wall 20b of the housing 20 to create a retaining force exerted by the clip 22 on the lid 40 in order to retain the lid 40 on the container rim 30b. To release the clip 22, the lever 22b is rotated outwardly and upwardly with respect to the side wall 20b of the housing 20 to release the retaining force, thereby placing the clip 22 in an intermediate position 24. Once in this position, the hook 22a of the clip 22 can be removed from engagement with the catch 42a of the handle 42 to place the clip 22 in the released position 25 and enable the lid 40 to be removed from engagement with the container rim 30b. Preferably, the side wall 20b of the housing 20 includes two clips 22 in diametrically opposed relation in order to better selectively retain the lid 40 on the container rim 30b.

Preferably, the clips 22 exert a sufficient amount of retaining force on the lid 40 to at least partially compress the gasket 46 between the ring 48 of the lid 40 and the container rim 30b, thereby preferably creating a sufficient seal therebetween to inhibit leakage of the food stuffs, particularly liquids, from within the interior 30a of the container 30. In turn, it is preferred that the handle 42 include two catches 42a, one

6

catch 42a corresponding to each of the clips 22. While it is preferred that there be at least one and preferably two clips 22, it is within the spirit and scope of the present invention that the slow cooker 10 include more than two clips 22 and more than two corresponding catches 42a, should a greater or more evenly distributed retention force be required or otherwise desired. Moreover, while it is preferred that the clips 22 be of the over-the-center type, it is within the spirit and scope of the present invention that the clips 22 be of a different type, provided they are capable of functioning in the manner described herein. Lastly, while it is preferred that the clips 22 be in diametrically opposing relation to one another, it is within the spirit and scope of the present invention that the clips 22 be arranged differently with respect to one another, provided the clips 22 are capable of functioning to retain the lid 40 in engagement with the container rim 30b.

Referring now to FIG. 2, the slow cooker 10, when assembled, has a vertical height H measured between the top of the handle 42 of the lid 40 and the bottom of the housing 20 or feet 28. It is preferred that the clips 22 are disposed entirely within the vertical height H of the housing 20 and lid 40 in order to facilitate storage and transport of the slow cooker 10. That is, it is preferred that, regardless of whether the clips 22 are in the engaged, intermediate, or released position 23, 24, 25, no part of the clips 22 extends beyond the vertical height H of the slow cooker 10. In this way, the space required for storage or transportation of the slow cooker 10, or at least the vertical space required therefor, is the same regardless of whether the clips 22 are in the engaged position 23 or the released position 25.

Referring to FIGS. 1 and 5, the housing 20 of the slow cooker 10 preferably includes handles 26 extending outwardly therefrom to enable the user to grasp and lift the assembled slow cooker 10 for movement thereof. Preferably, the handles 26 are in diametrically opposed relation to one another and are disposed along a major axis of the generally ovular housing 20.

The lid 40 preferably includes a lid rest 43 for selective engagement with one of the housing handles 26 in order to support the lid 40 when the lid 40 is removed from the container rim 30b. Preferably, the lid rest 43 is disposed on an inner surface of the lid 40. Preferably, the lid rest 43 is generally ovular in plan view and includes slightly curved protrusions or resting surfaces 43a extending outwardly from the inner surface of the lid 40 and generally disposed along a major axis of the ovular lid rest 43. When the lid 40 is removed from the container rim 30b, the user can choose to place one of the resting surfaces 43a in an abutting relation with one of the handles 26, as shown in phantom in FIG. 1, effectively hanging the lid 40 on the housing handle 26, and placing the lid 40 in an open position. In this way, the user can place the lid 40 in the open position to uncover the opening 30c of the container 30, while maintaining the lid 40 in engagement with the slow cooker 10, thereby eliminating the need to find free space on a countertop, table, or other surface on which the slow cooker 10 is located, in which to place the lid 40 apart from the slow cooker 10. Preferably, the resting surfaces 43a are slightly offset from a center of the lid 40 to allow the lid 40 to pivot slightly when the lid rest 43a is engaged with the housing handle 26. In this way, the lid 40 is able to balance on the housing handle 26 in a stable manner while the lid 40 is in the open position. Preferably, a portion of the lid 40 rests against the side wall 20b of the housing 20 in order to facilitate the balancing of the lid 40 on the housing handle 26. While this is preferred, it is not necessary for any portion of the lid 40 to abut or otherwise engage the side wall 20b of the housing 20 in order to balance the lid 40 in the open

US 7,947,928 B2

7

position. That is, it is further contemplated that the lid 40 be able to be placed in an open position in which the lid 40 hangs freely from the housing handle 26 with the only contact between the lid 40 and the housing 20 being the abutment of the lid rest 43 with the housing handle 26.

Referring still to FIG. 2, the side wall 20b of the housing 20 preferably further includes a bracket 16 thereon for selectively retaining a label (not shown) therein. In this way, a label with the name of the food stuffs within the slow cooker 10 can be displayed on the slow cooker 10 to facilitate the use of the slow cooker 10 in buffet-style dining situations.

In use, the container 30 is placed within the heating cavity 20c of the housing 20 and food stuffs are placed within the hollow interior 30a of the container 30 for cooking and/or warming thereof. The lid 40 is then placed on the container rim 30b and the knob 12 is turned to the proper setting for heating of the food stuffs. The spoon 50 or other utensil can be selectively used to stir or otherwise tend to the food stuffs within the interior 30a of the container 30. When not in use, the spoon 50 can be placed within the slot 44 of the handle 42 for storage thereof. If desired, the slow cooker can be removed from its electrical power source (i.e., unplugged) and transported to another location. To do so, the clips 22 are preferably placed in the engaged position 23 to create a retention force exerted by the clips 22 and at least slightly compress the gasket 46 of the lid 40 in order to retain the lid 40 in sealing engagement with the container rim 30b. In this way, the gasket 46 forms a seal between the edge of the lid 40 and the container rim 30b in order to at least inhibit spillage and/or leakage of food stuffs from within the interior 30a of the container 30 during transport or other movement of the slow cooker 10. When it is desired to remove the lid 40 from the container rim 30b, the clips 22 are moved to the released position 25 so that the lid 40 can be lifted from its engagement with the container rim 30b. If desired, the lid can be removed 35 from engagement with the container rim 30b and placed in the open position by hanging one of the resting surfaces 43a of the lid rest 43 on one of the housing handles 26 so that the container opening 30c is uncovered. This allows the user to access the interior 30a of the container 30 without requiring the user to hold on to the lid 40 or find a free space in which to place the lid 40.

In this way, the slow cooker 10 of the present invention is capable of being used as a conventional slow cooker in order to heat and/or warm food stuffs within the slow cooker 10. The slow cooker 10 has the additional capability of retaining the lid 40 in sealing engagement with the container rim 30b using the clips 22 in order to allow movement of the slow cooker 10 with little to no fear of the food stuffs within the slow cooker 10 spilling or leaking therefrom. Additionally, the slot 44 of the handle 42 of the lid 40 allows for the spoon 50 or other utensil to be retained therein in order to facilitate transportation of the slow cooker 10 with the spoon 50 as a single unit. An additional benefit of the slow cooker 10 is that the spoon 50 can be retained within the slot 44 of the handle 42 when not serving and/or tending to the food stuffs, thereby eliminating the need to find a free surface on which to place the spoon 50. In like manner, as described above, the lid 40 can be rested on the housing handle 26 when access to the interior 30a of the container 30 is desired, thereby eliminating the need to find a free surface on which to place the lid 40. Storing of the spoon 50 within the slot 44 when not serving/ tending and resting of the lid 40 on the housing handle 26 during serving/tending also yields another benefit of the slow cooker 10 by reducing the amount of cleaning of the surrounding surfaces required after use of the slow cooker 10 because no additional surfaces need be dirtied by food stuffs

8

dripping or otherwise being transferred from the lid 40 and/or the spoon 50 to the surrounding surfaces. At most, only the area directly under the housing handle 26 would require cleaning due to food stuffs and/or residue dripping from the lid 40 onto the surface below when the lid 40 is placed on the housing handle 26 in the open position.

It will be appreciated by those skilled in the art that changes could be made to the embodiment described above without departing from the broad inventive concept thereof. It is understood, therefore, that this invention is not limited to the particular embodiment disclosed, but it is intended to cover modifications within the spirit and scope of the present invention as defined by the appended claims.

We claim:

1. A slow cooker for heating of food stuffs, the slow cooker comprising:

a housing having a base and a side wall extending therefrom to define a heating cavity within the housing, the housing further having a housing rim at a first, free edge of the side wall defining an opening to the heating cavity;

a heating element disposed within the housing sufficiently proximate the heating cavity to heat the heating cavity;

a container having a generally hollow interior and a container rim defining an opening for accessing the interior thereof, the interior being capable of retaining the food stuffs therein, the container being shaped and sized to fit within the heating cavity of the housing for heating thereof by the heating element;

a lid sized and shaped to at least partially cover the opening of the container when placed on the container rim, the lid having a gasket around an outer edge thereof for sealing engagement with the container rim; and

at least one clip mounted between the lid and the side wall of the housing, the at least one clip being an over-the-center clip having a hook and a catch, one of the hook and catch being mounted on one of the lid and side wall of the housing and the other of the hook and catch being mounted on the other of the lid and side wall of the housing, the at least one clip being selectively engageable with the lid and side wall of the housing to selectively retain the lid in sealing engagement with the container rim to inhibit leakage of the food stuffs from the interior of the container, wherein the housing and lid have a vertical height, the at least one clip being disposed entirely within the vertical height of the housing and lid to facilitate storage and transport of the slow cooker when the at least one clip is engaged with the lid and side wall of the housing.

2. The slow cooker of claim 1, wherein the at least one clip is releasably engageable with the lid, such that, in an engaged position, the at least one clip retains the gasket of the lid in sealing engagement with the container rim and, in a released position, the lid can be removed from the container to allow access to the interior of the container.

3. A slow cooker for heating of food stuffs, the slow cooker comprising:

a housing having a base and a side wall extending therefrom to define a heating cavity within the housing, the housing further having a housing rim at a first, free edge of the side wall defining an opening to the heating cavity;

a heating element disposed within the housing sufficiently proximate the heating cavity to heat the heating cavity;

a container having a generally hollow interior and a container rim defining an opening for accessing the interior thereof, the interior being capable of retaining the food stuffs therein, the container being shaped and sized to fit

US 7,947,928 B2

9 10

within the heating cavity of the housing for heating thereof by the heating element;

a lid sized and shaped to at least partially cover the opening of the container when placed on the container rim, the lid having a gasket around an outer edge thereof for sealing engagement with the container rim; and

at least one clip mounted between the lid and the side wall of the housing, the at least one clip being an over-the-center clip having a hook and a catch, one of the hook and catch being mounted on one of the lid and side wall of the housing and the other of the hook and catch being mounted on the other of the lid and side wall of the housing, the over-the-center clip including a lever and the hook being shaped to extend from the lever and around the container rim when the container is disposed within the heating cavity of the housing, the at least one clip being selectively engageable with the lid and side wall of the housing to selectively retain the lid in sealing engagement with the container rim to inhibit leakage of the food stuffs from the interior of the container, wherein the housing and lid have a vertical height, the at least one clip being disposed entirely within the vertical height of the housing and lid to facilitate storage and transport of the slow cooker when the at least one clip is engaged with the lid and side wall of the housing.

4. The slow cooker of claim 3, wherein when the hook is placed around the catch, the lever is rotated to create a retaining force exerted by the clip on the lid in order to retain the lid on the container rim.

5. The slow cooker of claim 1, wherein the catch is in the form of a small, slightly hooked, elongate protrusion to selectively engage the hook of the clip.

6. A slow cooker for heating of food stuffs, the slow cooker comprising:

a housing having a base and a side wall extending therefrom to define a heating cavity within the housing, the housing further having a housing rim at a first, free edge of the side wall defining an opening to the heating cavity, the housing including two diametrically opposed handles disposed along a major axis of the housing and extending outwardly therefrom to enable the user to grasp and lift the assembled slow cooker for movement thereof;

a heating element disposed within the housing sufficiently proximate the heating cavity to heat the heating cavity;

a container having a generally hollow interior and a container rim defining an opening for accessing the interior thereof, the interior being capable of retaining the food stuffs therein, the container being shaped and sized to fit within the heating cavity of the housing for heating thereof by the heating element;

a lid sized and shaped to at least partially cover the opening of the container when laced on the container rim, the lid having a gasket around an outer edge thereof for sealing engagement with the container rim; and

two clips mounted between the lid and the side wall of the housing in diametrically opposed relation, the clips being aligned with the handles, each clip being an over-the-center clip having a hook and a catch, one of the hook and catch of each clip being mounted on one of the lid and side wall of the housing and the other of the hook and catch of each clip being mounted on the other of the lid and side wall of the housing, each clip being selectively engageable with the lid and side wall of the housing to selectively retain the lid in sealing engagement with the container rim to inhibit leakage of the food stuffs from the interior of the container, wherein the housing and lid have a vertical height, each clip being disposed entirely within the vertical height of the housing and lid to facilitate storage and transport of the slow cooker when each clip is engaged with the lid and side wall of the housing.

7. The slow cooker of claim 6, wherein each over-the-center clip has a lever and the hook of each over-the-center clip is shaped to extend from the lever and around the container rim when the container is disposed within the heating cavity of the housing.

* * * * *

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d)(1)(B), I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following registered CM/ECF users:

Timothy C. Bass
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
basst@gtlaw.com
*Attorney for Appellee Sunbeam Products, Inc.*

Richard D. Harris
Kevin J. O'Shea
Matthew J. Levinstein
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
harrisr@gtlaw.com
osheak@gtlaw.com
levinsteinm@gtlaw.com

Kimberly A. Warshawsky
GREENBERG TRAURIG, LLP
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
warshawskyk@gtlaw.com

*Attorneys for Appellee Sunbeam Products, Inc*

   /s/ Robert M. Tyler

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 13,423 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font and Times New Roman font style.

/s/ Robert M. Tyler
Robert M. Tyler (VSB No. 37861)
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (Fax)
rtyler@mcguirewoods.com

Attorney for Appellant Hamilton Beach Brands, Inc.